**STATE of Maine**

v.

**Paul H. O'NEAL.**

Supreme Judicial Court of Maine.

Argued June 18, 1981.

Decided Aug. 5, 1981.

Charles K. Leadbetter, Linda Sibery Crawford (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Sandy & Sandy, Robert E. Sandy, Jr. (orally), Waterville, for defendant.

Before McKUSICK, C. J., and WERNICK, NICHOLS, ROBERTS and CARTER, JJ.

WERNICK, Justice.

Defendant Paul H. O'Neal has appealed from a judgment convicting him of having murdered his eighteen month old stepdaughter, Eva Marie Knowles. The judgment was entered on the verdict of a jury returned in the Superior Court (Kennebec County).[1]

The day after the child's death, pathologist Dr. Ronald Roy, Deputy Chief Medical Examiner for the State of Maine, per-

---

**1.** This was defendant's second trial on the charge of murder. His first trial ended in a mistrial when the jury was unable to reach a verdict.

formed an autopsy. It disclosed that the cause of death was multiple skull fractures and internal injuries caused by a beating. Dr. Roy stated that the character of the numerous bruises observed on the child's upper body was consistent with repeated contact with a flat surface such as the floor or a wall. Dr. Roy observed that the child's anus was dilated, but he found no rectal or vaginal abnormality. He testified that the anal dilation was probably caused either by abnormal "post-relaxation" or by some type of penetration but that he could not identify the cause in this case.

Dr. Roy sent samples of the hair found on the victim's body and swabs of all body cavities to the State crime laboratory. A state serologist testified that microscopic analysis demonstrated that all hair found on the victim was her own. Examination of the swabs disclosed the presence of no foreign substances.

The record shows that on the evening of the murder, defendant and his wife, Joan Knowles O'Neal,[2] were visited by defendant's brother Patrick O'Neal and Patrick's girl-friend Cindy Bernardini. The four spent the evening playing cards, watching television and drinking. Patrick and Cindy left around midnight. Defendant left his apartment soon after his guests, to walk to the home of Jerome Hutchins to drink a few more beers. When defendant left, Eva was asleep on the living room couch. At the Hutchins home defendant found the family asleep. He awakened Mrs. Hutchins. Mrs. Hutchins testified that she told defendant to leave and that he did so soon after his arrival. Defendant testified that Jerome Hutchins got up and they had a few beers in the Hutchins' kitchen. In any event, defendant eventually left the Hutchins home and returned to his apartment.[3]

Defendant testified that he returned home without a key and was admitted by his wife who responded to his pounding on the door. He stated that after he arrived at his apartment his wife went to bed, and he went to the couch in the living room to remove his prosthesis.[4] According to defendant, Eva was not sleeping on the couch when he returned home.

Defendant testified as to subsequent events as follows. He hopped about the apartment between the living room, bathroom and kitchen, eventually returning to the couch where he passed out. He awoke sometime later because he had to go to the bathroom. On his way back to the couch he decided to check Eva. He opened the door of her room and found her unconscious on the floor. He took her to his wife and the emergency squad was called. The call was recorded at 2:51 a. m. on June 13, 1979.

2. At the time of trial defendant and his wife were divorced. Mrs. O'Neal had resumed use of her maiden name and testified as "Joan Knowles."

3. The time of his return can be estimated from the testimony of neighbors in the apartment building. However, this testimony is unclear and conflicting. Thomas McCann, who lived in an apartment on the floor below the defendant, testified that upon returning from his job after midnight, he was awake and doing housework until after the time the rescue squad arrived. He heard someone come up the stairs "about an hour" before the rescue squad arrived. Virginia Gilley, who lived above the defendant, stated, by reference to a television program, that she heard thumping noises below her at approximately 1:30 a. m. When she went downstairs and knocked on the door of the O'Neal apartment, the defendant, dressed in jeans, came to the door immediately. Defendant testified that upon his return to the apartment he removed his artificial leg and hopped about the apartment between the kitchen, bathroom and living room before passing out on the couch. Doris Burns, a downstairs neighbor, testified that she first heard walking back and forth and then a baby crying. Mrs. Burns testified that the crying started normally and then became very loud "like it was crying for its life." She stated that she also heard a thumping noise as though "somebody had something and kept beating it against the side of the wall." Mrs. Burns estimated that she heard these noises between midnight and 1:00 a. m. She testified that she knocked on the wall requesting quiet and heard a male voice say "shut your G.D. mouth, I pay rent up here and I'll do as I G.D. want to."

4. In 1977 defendant was involved in a train accident which resulted in the loss of his right leg below the knee and a portion of his right hand.

In her testimony Joan Knowles gave the following version of events. Soon after defendant left to visit Jerome Hutchins, Joan went to bed. Eva was asleep on the couch at that time. Joan heard no noises during the evening and was awakened only twice: once by defendant's pounding to be let in and again when defendant brought the injured child to her.

Eva was taken by emergency vehicle to the hospital where she was first examined by emergency room physician Dr. William Taggert. Dr. Dorothy Eisengart, the victim's pediatrician, was called to the emergency room and also examined the child. Both doctors testified that the child was covered with bruises and abrasions, particularly on the upper part of her body. They found that she had sustained multiple skull fractures and severe internal injuries. Both doctors observed that the child's anus was dilated. Eva died sometime after 4:00 a. m. June 13, 1979 from her injuries.

Defendant and his wife were driven to the hospital by Cindy Bernardini. Soon after arrival at the hospital and before arrest, defendant was approached by Oakland Police Officer Jeff Conlin who asked the defendant to accompany him to a small room located off the emergency room. Defendant complied with Officer Conlin's request. Oakland Police Chief Joel Abbott joined them.

Officer Conlin read a *Miranda* card to the defendant at approximately 3:30 a. m. on June 13, 1979. When asked, defendant stated that he understood the rights stated to him. Office Conlin then inquired "having these rights in mind, do you wish to talk to us now without having a lawyer present?" Defendant responded "No." After receiving this negative response, the Officers took the defendant out of the small room and asked him to take a seat in the corridor.

Defendant was subsequently arrested for aggravated assault and taken by Chief Abbott to the Waterville Police Station, where they arrived at approximately 4:00 a. m.

At the station, according to Chief Abbott's testimony, defendant was placed in a cell, and Chief Abbott "filled in" the officers present. This briefing included a statement that defendant "wasn't talking."

At approximately 4:40 a. m. Maine State Police Sergeant Ronald Veilleux arrived at the Waterville Police Department. He had been informed of the assault and on his way to the police station learned that the victim was dead. Sergeant Veilleux testified that having been "briefed" by the officers present, he "asked, in general, if Mr. O'Neal had been advised of his *Miranda* rights." He was not given a satisfactory answer to this question. Sergeant Veilleux then requested that the defendant be brought from his cell to an area in the guard room for the purpose of interrogation. When defendant was brought in, Sergeant Veilleux identified himself as a police officer, explaining that he wanted to talk with defendant. He then asked defendant a series of "background questions": name, address, birth date, educational background, marital status, and number of children. After these preliminary questions, Sergeant Veilleux read defendant his *Miranda* rights. Defendant stated that he understood the rights, and Sergeant Veilleux asked defendant if he wished to talk at that time without the benefit of a lawyer. Defendant responded affirmatively. In the course of the questioning that followed defendant made various statements that were admitted as evidence at trial.

The charge against defendant was "knowing and intentional" or "depraved indifference" murder. Prior to defendant's second trial, defense counsel filed a number of motions. One was a motion to suppress defendant's statements to Officer Veilleux. Several other motions, although labeled motions to suppress, were in the nature of requests for proceedings *in limine* to obtain preliminary rulings on the admissibility of certain evidence.[5] Defendant sought, among others, pre-trial determinations, as to (1) the admissibility in evidence of cer-

---

5. The distinction between a motion to suppress and a motion *in limine* was clarified in *Gendron* v. *Pawtucket Mutual Insurance Company*, Me., 409 A.2d 656, 659 (1979).

tain testimony by Drs. Taggert and Eisengart and by defendant's brother Patrick O'Neal, all to the effect that defendant had sexually abused his step-daughter; and (2) color photographs of the victim claimed to be impermissibly prejudicial.

The presiding justice conducted a series of pre-trial hearings to consider defendant's motions. He denied the motion to suppress defendant's statements to Officer Veilleux, apparently on the ground that defendant had made a valid waiver of his right to counsel. *State v. Stone*, Me., 397 A.2d 989 (1979). After careful questioning of the testifying physicians concerning which of the color photographs were necessary to illustrate their testimony, the presiding justice ruled that three photographs (numbered 1, 6 and 7) were to be admitted and the others excluded.[6] The presiding justice also ruled that he would admit the testimony of Drs. Taggert and Eisengart concerning the existence, and *possible* causes, of the victim's dilated anus. The trial justice heard Patrick O'Neal testify that on several occasions in the weeks prior to the murder he had observed the defendant enter Eva's room while she was sleeping, pull down her training pants and pinch her vagina. Rejecting defendant's pre-trial contention that Patrick O'Neal's testimony was not relevant to any issue to be decided by the jury, the presiding justice stated:

"I disagree that it has no probative—it has great probative value, whether it is so highly prejudicial that it outweighs—At this time I want to hear the rest of the testimony before I make any evaluation."

After then hearing at the pre-trial proceeding the testimony of Drs. Roy, Taggert and Eisengart, the justice ruled, *in limine*, that Patrick O'Neal's testimony concerning prior incidents of alleged sexual abuse would be admissible as evidence at the trial.

On appeal, defendant raises numerous assignments of error, among them the propriety of the admission at trial of Patrick O'Neal's testimony and the admission of statements made to Officer Veilleux during interrogation on the night of the murder.

*1.*

We conclude that the admission in evidence at trial of the testimony of Patrick O'Neal concerning alleged incidents of sexual abuse of the child Eva by defendant was so impermissibly prejudical as to deprive defendant of a fair trial. We, therefore, sustain the appeal and set aside the judgment of conviction.

As we have already stated, the presiding justice ruled *in limine* that the testimony of Patrick O'Neal would be admissible at trial. At the trial, however, when the State, in presenting its case in chief, called Patrick O'Neal as a witness, the presiding justice summoned counsel for a bench conference. At the conference, the justice took the special precaution to state on the record that in the context of all the evidence he had heard at trial, he now considered Patrick O'Neal's testimony so impermissibly prejudicial that, had he not already made an *in limine* ruling and were he ruling for the first time at trial, he would refuse to admit O'Neal's testimony.[7] Deeming himself, in fairness to the prosecution, obligated to adhere to his *in limine* ruling, the justice informed coun-

---

6. We laud the presiding justice for using this approach in his efforts to weigh the needs of the physician witnesses against danger of impermissible prejudice to the defendant. We add the observation that although the presiding justice's pre-trial ruling authorized the admission of only three photographs, numbered 1, 6 and 7, apparently five photographs, numbered 1, 2, 3, 6 and 7, found their way into the case as evidence.

7. The justice's exact words were as follows: "I've already ruled on that [the admissibility of Patrick O'Neal's testimony]. I'm going to allow it, but I'm going to tell you right now—

after sitting and listening to this case; that if this was presented to me now I wouldn't allow it, because I think the prejudicial effect is tremendous in this case. . . . My reaction—and I want the record to show—that after listening to all of the evidence in this case, I get a different perspective than when it was presented to me out of context, . . . . I'm going to let it go because I have said I will do it. I want the record to show that I'm doing it with a great deal of reluctance. . . . It is my honest feeling at this time, that the prejudicial effect of this type of evidence far outweighs the probative value."

sel that for this reason only he would allow the State to present the testimony of Patrick O'Neal.[8] Having heard the presiding justice speak as he did, the State elected not to present Patrick O'Neal's testimony as part of its case in chief.

Our view is that the above quoted portion of the presiding justice's remarks is a plain and definitive statement, by that person who sees and hears first hand the impact of the testimonial evidence and is therefore vested with substantial discretion to make the balancing determination involved in ruling on the admissibility of Patrick O'Neal's testimony, that the impermissible prejudice to defendant resulting from Patrick O'Neal's testimony far exceeded the probative value of such testimony. Far from discerning an abuse of discretion—which would be the criterion we as an appellate tribunal would apply to find error in the assessment of prejudice, *Minott v. F. W. Cunningham & Sons*, Me., 413 A.2d 1325 (1980),—we agree with the presiding justice in light of our reading of the entire record. As the presiding justice incisively and pungently made the point:

"You put this into the case and you've hung this guy. You have a jury there that is not going to allow or tolerate any man fondling a 1½ year old child."

With further incisiveness, the justice added:

"This child was not killed by sexual abuse. ... The sexual act didn't lead to the death of this child and I think in fact could be inconsistent. Is it rational that a person can have sex, no matter how base it may be—with a year and a half old child, and then beat the child to death."

The State's argument on appeal is that even though Patrick O'Neal's testimony should have been properly excluded as part of the State's case in chief, it was admissible on rebuttal to counter (1) defendant's testimony on direct examination that he was "a good father" to Eva and (2) even more cogently, defendant's emphatic nega-

tive response to the following question posed by the State on cross-examination:

"Now, Mr. O'Neal, isn't it true that on at least two occasions during the time you lived in this apartment that you went to Eva's bedroom when she was asleep and pulled down her training pants and pinched her in her privates or genital area. Is that true?"

As to the second part of the State's contention,—most particularly where, as here, the presiding justice has expressly put on the record his conclusion that Patrick O'Neal's testimony should be excluded because of its highly unfair prejudicial nature, —we simply will not permit the State to gain the benefit of that unfair prejudice through the subterfuge technique of itself raising the unfair prejudicial, and collateral, matter of sexual abuse by a question in its cross-examination of defendant and then seizing on defendant's response to justify claiming the right to present the unfairly prejudicial evidence as rebuttal testimony.

Moreover, even under the general rule regarding collateral matters raised on cross-examination, Patrick O'Neal's testimony on rebuttal could not be admissible. Field and Murray has summarized the rule as follows:

"[i]if a matter is collateral, the cross-examiner must 'take the witness's answer'; that is, he cannot contradict it through another witness. The Law Court has repeatedly referred to the long established rule that a witness can not be cross-examined on collateral matters for the purpose of subsequently contradicting him and impeaching him in relation to such collateral matters." R. Field and P. Murray, *Maine Evidence*, § 607.4 (1976).

*See also State v. Bunker*, Me., 351 A.2d 841 (1976).

We reject, too, the first facet of the State's contention, that it was entitled under Rule 404(a)(1) M.R.Evid. to rebut the defendant's testimony, given on direct examination, that he was "a good father." Even if defendant's statement that he was a good father arguably may be

---

8. Recognizing, correctly, that he was not legally bound by his preliminary ruling, the justice stated:

"I know I can change my mind. But the State has prepared its case upon my ruling and I think it would be most unfair . . . ."

"a pertinent trait of his character offered by ... [him]"

thus to be arguably within the exception to inadmissibility set out in Rule 404(a)(1) M.R.Evid., the prosecution's rebuttal thereof is required by Rule 405(a) M.R.Evid. to be by "testimony as to reputation." Patrick O'Neal's testimony plainly was not "testimony as to reputation."

We conclude that in all the circumstances here, Patrick O'Neal's testimony was erroneously admitted in evidence.

The remaining question is whether it was error requiring that the judgment of conviction for murder be set aside.

At the outset, we repudiate the State's claim that defendant failed to object to the admission of Patrick O'Neal's testimony and that, therefore, a showing of manifest injustice is requisite if the judgment of conviction is to be set aside. We find that whenever the State attempted to introduce the testimony of Patrick O'Neal, defendant made objections that were as specific as could reasonably be expected, given the lack of clarity characterizing the State's articulation of its theories of admissibility.

In any event, the presiding justice took great pains to place on record for our benefit comments as to the high degree of unfair prejudice to defendant inhering in Patrick O'Neal's testimony. These comments leave no doubt in our minds that the error of admitting such testimony did cause manifest injustice (even were this the standard for reversal). A fortiori, the error could not be harmless, and, therefore, since defendant did save the error for appellate cognizance, the judgment of conviction must be set aside.

2.

Our decision that the judgment of conviction must be set aside solely by reason of the unfair prejudice caused defendant by the admission in evidence of Patrick O'Neal's testimony ordinarily would make unnecessary the consideration of defendant's other claims of error. However, in the interest of judicial economy, we will address one such other claim that can have important bearing at a retrial.

Defendant contends that the presiding justice improperly refused to suppress statements made by him to Police Sergeant Veilleux on the morning Eva died. As described above, defendant was read his *Miranda* rights at the hospital. He responded negatively when asked if he would like to talk to the police without having an attorney present. Less than an hour later, while in custody at the Waterville Police Department, defendant was approached by State Police Sergeant Veilleux who once again gave him the *Miranda* warning. Defendant manifested his willingness to respond to questions. In the course of the subsequent interrogation Sergeant Veilleux asked the defendant:

"Have you ever attempted to have intercourse with penis, or finger with Eva?"

The defendant replied:

"No way.... Eva was constipated and would bleed. We took her to a doctor and got some pills. She had that problem for the last two months."

The presiding justice admitted this statement, apparently on the grounds that although defendant had initially chosen to exercise his constitutional right to counsel, he had subsequently made a knowing and intelligent waiver of the right.

Upon a retrial of this case, the admissibility of defendant's statement to Sergeant Veilleux should be reconsidered in light of the recent decision by the Supreme Court of the United States in *Edwards v. Arizona,* —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In *Edwards* the Supreme Court established the following standard for evaluating whether a defendant who has asked for counsel has subsequently waived that right:

"Second, although we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, *see North Carolina v. Butler,* ... [441 U.S. 369 (1979)] at 372–376 [99 S.Ct. 1755 at 1757–1759, 60 L.Ed.2d 286], the Court has strongly indicated that additional safeguards are necessary when the

accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Id.* at ——, 101 S.Ct. 1884.

A justice called upon to apply the *Edwards* standard in the circumstances of the case at bar should first assess whether defendant's response to Officer Conlin constituted an exercise of his right to have counsel present during custodial interrogation. In addition, the justice should consider what significance, if any, attaches to the Supreme Court's description in *Edwards* of the second set of interrogating detectives as being "colleagues" of the original interrogator. Lastly, the justice should determine whether in the circumstances shown defendant had "initiated" the contact with Sergeant Veilleux.

The entry shall be:

Appeal sustained; judgment of conviction set aside.

Case remanded to the Superior Court for further appropriate proceedings.

All concurring.