STATE of Maine

v.

Bryan BOURGEOIS.

Supreme Judicial Court of Maine.

Argued Jan. 5, 1994.

Decided April 4, 1994.

Stephanie Anderson, Dist. Atty. and Jane Elizabeth Lee (orally), Asst. Dist. Atty., Portland, for the State.

Peter E. Rodway (orally), Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, RUDMAN and DANA, JJ.

DANA, Justice.

Bryan Bourgeois appeals from the judgments entered in the Superior Court (Cumberland County, *Perkins, A.R.J.*) on jury verdicts finding him guilty of aggravated assault, 17–A M.R.S.A. § 208 (1983),[1] reckless conduct with a dangerous weapon, 17–A M.R.S.A. §§ 211, 1252(4) (1983),[2] and operating a motor vehicle while under the influence

---

1. Title 17–A M.R.S.A. § 208 provides as follows:
   1. A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly causes:
      A. Serious bodily injury to another; or
      B. Bodily injury to another with use of a dangerous weapon; or
      C. Bodily injury to another under circumstances manifesting extreme indifference to the value of human life. Such circumstances include, but are not limited to, the number, loca-

tion or nature of the injuries, the manner or method inflicted, or the observable physical condition of the victim.

2. Title 17–A M.R.S.A. § 211(1) provides that a person "is guilty of reckless conduct if he recklessly creates a substantial risk of serious bodily injury to another person." If the crime was committed with a dangerous weapon, it is a class C offense. 17–A M.R.S.A. § 1252(4).

of intoxicating liquor, 29 M.R.S.A. § 1312–B (Pamph.1993) ("OUI").[3] Bourgeois contends that the court erroneously admitted evidence of prior acts of violence and the State improperly asked Bourgeois whether he believed other witnesses had lied. Because the trial court erred in admitting evidence of prior acts of violence, we vacate the judgments.

## I. *Facts*

### A. *The Events of April 27 to 28, 1991*

At 2:00 a.m. on April 28, 1991, Bourgeois drove his car off the Maine Turnpike, causing severe injuries to his wife, Cathy. As a result of this incident, Bourgeois was charged with attempted murder, aggravated assault, reckless conduct with a dangerous weapon, and OUI.

Both Bourgeois and Cathy testified that they went to five bars in the Portland area on the night of April 27, 1991. Their accounts as to what happened that night are markedly different. According to Cathy, Bourgeois consumed one or two drinks at each bar. At the fourth bar, she saw him hugging and kissing another woman, Tanya Gerrish. When Cathy became upset, Bourgeois explained that Gerrish was merely a friend. Later that night, the couple encountered Gerrish again. After a heated exchange, Gerrish knocked Cathy to the ground and pounded her head into the sidewalk. After a police officer separated the women, Bourgeois and Cathy returned to their car. On their way home, Bourgeois told Cathy that their marriage was "over."[4] Cathy yelled at Bourgeois for not protecting her from Gerrish, whereupon he punched her in the face, repeatedly threatened to kill her by beating her or by turning the car over, and prevented her from fastening her seat belt. Bourgeois then looked for the right place from which to drive off the turnpike in his attempt to kill his wife. Cathy managed to fasten her seat belt just as Bourgeois drove the car over an embankment. After she regained consciousness, Bourgeois grabbed her hair and threatened to kill her if she told the authorities what happened.

Bourgeois denied most aspects of Cathy's account. He testified that he ordered four drinks the entire evening and did not finish the fourth. During the car ride home, Cathy was angry with him for not intervening in the fight, and started to hit him. Bourgeois denied hitting Cathy, and instead tried to calm her down. After he told her that he should have never left his girlfriend, she started to hit him again. As a result, he "lost control of the vehicle and the next thing [he] knew [they] were sitting down in the marsh [off] the turnpike." According to Bourgeois, Cathy tried to convince him to lie about the accident by telling authorities that another car had pushed them off the turnpike.

State Trooper Kevin Curran, who was the first to arrive at the scene of the accident, observed that Bourgeois's eyes were glassy and that he smelled of alcohol. Based on tire marks, Curran concluded that Bourgeois had not applied the brakes before the car went off the highway. Curran also estimated that at the time of the accident Bourgeois was driving between 50 and 60 miles per hour.

### B. *The Defendant's Reputation for Non-violence*

Mary Ann Piner testified that she had known Bourgeois for five years and, at the time of the trial, was engaged to him. Defense counsel asked Piner whether she had any knowledge of Bourgeois's reputation for being a violent person. She responded that he did not have such a reputation. Bourgeois later agreed with the following question posed by the State: "you wouldn't threaten to kill, harm or hurt anybody, correct?"

In an attempt to rebut the testimony of Bourgeois's nonviolent reputation, the State called Bourgeois's first wife, Rosalie Bourgeois. The State maintained that Rosalie's testimony also was relevant to the issue of Bourgeois's intent and absence of mistake

---

**3.** Title 29 M.R.S.A. § 1312–B provides that a person is guilty of a criminal violation if he operates a motor vehicle "while under the influence of intoxicating liquor."

**4.** Although the couple was living together at the time, Bourgeois recently had been living with his girlfriend and had filed for a divorce.

when he drove off the turnpike. Over Bourgeois's objection, the court admitted the testimony on both grounds.

Rosalie testified that in the summer of 1983 she and Bourgeois were experiencing marital problems. After they went out for dinner and drinks one evening, they returned to their car, whereupon Bourgeois punched Rosalie in the head. He continued to hit Rosalie as he drove, and told her that he was going to kill her. After driving to a deserted road, he ordered her out of the car, told her to remove her clothes, and after she complied, threw her clothes in the car, told her to "die," and then drove away. After a few minutes, he returned and attempted to run over her eighteen times. Rosalie also testified that, about one year later, Bourgeois threatened to kill her with a knife. In neither instance were criminal charges filed.

In surrebuttal testimony, Bourgeois denied that these incidents occurred. He testified that he and Rosalie had pulled off to the side of the road because they were kissing. When Bourgeois called Rosalie by another woman's name, Rosalie became hysterical and left the car half-dressed. Despite his attempts to get her back in the car, she refused. Bourgeois denied trying to run her down. He also denied that he later threatened her with a knife.

The jury found Bourgeois not guilty of attempted murder and guilty of aggravated assault, reckless conduct with a dangerous weapon, and OUI. The court sentenced him to eight years in prison, with all but six suspended, and four years of probation, and ordered that he pay $14,352 in restitution to Cathy. For the OUI conviction, the court fined Bourgeois $400 and suspended his li-

cense for ninety days. Bourgeois timely filed this appeal.

## II. *Evidence of Prior Bad Acts*

We review the trial court's evidentiary rulings for clear error or an abuse of discretion. *State v. Shuman*, 622 A.2d 716, 718 (Me.1993). In doing so, "we accord wide discretion to the court's determinations on the relevancy of the proffered evidence, as well as to its evaluation of any unfair prejudice that may result from the admission of the evidence." *Id.* (citations omitted). Moreover, "[t]he extent to which counsel may cross-examine witnesses as to collateral issues for purposes of impeachment is left to the sound discretion of the trial [court]." *State v. Brown*, 321 A.2d 478, 483 (Me.1974).

Bourgeois acknowledges that, because he introduced evidence of his reputation for nonviolence, "evidence of [his] character for violence was indeed admissible" pursuant to M.R.Evid. 404(a)(1).[5] He argues, however, that pursuant to M.R.Evid. 405 the State could only introduce reputation evidence in its rebuttal, *not* evidence of specific instances of conduct.[6] Thus, evidence that Bourgeois allegedly assaulted his first wife, attempted to run over her with his car, and threatened her with a knife, was erroneously admitted. He contends that this evidence resulted in unfair prejudice, denying him a fair trial.

The State contends that Bourgeois made his character an issue by introducing evidence of his reputation for nonviolence and therefore "opened the door" to rebuttal testimony. Since the State can cross-examine a reputation witness as to specific instances of

---

**5.** M.R.Evid. 404 provides in pertinent part as follows:

(a) **Character Evidence Generally.** Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of Accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same. . . .

(b) **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person

in order to show that he acted in conformity therewith.

**6.** M.R.Evid. 405 provides as follows:

(a) **Reputation.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) **Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made to specific instances of his conduct.

conduct pursuant to M.R.Evid. 405(a), calling its own witness to so testify achieves the same result. Thus, the State concludes that the only error was in the "method" of its proof. There is simply no merit to this argument.

Rule 404(a)(1) provides that an accused may offer evidence of a pertinent character trait, and that the prosecution may rebut the same. Rule 405, however, provides that reputation evidence is the *exclusive* method by which a character trait may be proven on direct examination. *See State v. Eaton,* 309 A.2d 334, 337 (Me.1973) ("When admissible, character evidence is limited to evidence of reputation for certain traits of character and cannot be shown by specific acts of wrongdoing."). This rule also applies to the direct examination of rebuttal witnesses. *See* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 405[02] at 405–23 to 24 (1993). Unless character is an essential element of the offense charged, the only inquiry that can be made into specific instances of conduct is, as M.R.Evid. 405(a) provides, through cross-examination of the character witness.[7]

In *State v. Wyman,* 270 A.2d 460, 463 (Me.1970), we explained the justification for this rule:

> The reason for the rule of exclusion lies in the tendency of triers of fact to give excessive weight against the accused respecting any specific illegal activity. It further tends to confuse the jury concerning the main issue of guilt or innocence of the offense charged and calls upon the accused to account for past wrongdoings for which he is not being tried. The main thrust of

such evidence, such as other unrelated wrongful acts of the accused, is to pollute the minds of the jury against the defendant. *State v. Garceau,* [122 Vt. 303, 170 A.2d 623 (1961)]. "If such testimony should be admitted, the defendant might be overwhelmed by prejudice, instead of being tried upon the evidence affirmatively showing his guilt of the specific offense with which he is charged." *City of Topeka v. Harvey,* [188 Kan. 841, 365 P.2d 1109 (1961)].

We hold that Rosalie's testimony was erroneously admitted to rebut the testimony of Bourgeois's nonviolent reputation. Contrary to the State's contention, Rosalie's testimony was inadmissible pursuant to Rule 405. In effect, Bourgeois was required to defend against allegations of violent acts that occurred eight years earlier. The evidence involving his first wife has such a tendency to taint the minds of the jury, he was deprived of a fair trial. *See State v. O'Neal,* 432 A.2d 1278, 1282–83 (Me.1981) (where defendant was charged with murder of stepdaughter, State's attempt to rebut defendant's assertion that he was a "good father" by calling witness to testify that defendant sexually abused stepdaughter was so "impermissibly prejudicial" that judgment must be set aside).

■ The State next argues that, even if Rosalie's testimony was not admissible to rebut evidence of Bourgeois's nonviolent reputation, it was admissible to prove his affirmative intent and absence of mistake when he drove his car off the turnpike with Cathy. *See State v. Heald,* 393 A.2d 537, 542 (Me.

---

7. It should also be noted that "[t]he objective of cross-examination of a character witness for an accused is to show an inadequate basis for the reputation to which the witness has testified on direct." Field & Murray, *Maine Evidence* § 405.2 at 4–59. Moreover,

> [t]he proper method of cross-examining such a witness is to inquire whether he or she has heard of a given fact, misdeed, or criminal conviction in order to ascertain whether or not there is adequate basis for the community opinion being reported in the form of reputation. However, asking whether the witness has heard of a given misdeed carries the implication that the accused actually committed it, and the harm cannot be cured by instructions

as to the limited purpose. The trial judge will be well advised to ... guard against misuse by ascertaining out of the jury's hearing that the question relates to an actual event and was not a random shot or a groundless question to "wa[f]t an unwarranted innuendo into the jury box."

*Id.* at 4–59 to 60 (quoting *Michelson v. United States,* 335 U.S. 469, 481, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948)). Before a prosecutor or defense attorney cross-examines a character witness as to specific conduct, he or she must have a good faith belief that such conduct actually occurred and that it is relevant to the character trait to which the witness testified.

1978) (quoting *Eaton*, 309 A.2d at 338). Although there are similarities between the two incidents, we disagree with the State's contention.

In *State v. Shuman*, 622 A.2d 716, 718 (Me.1993), we held that "[s]imilar threats or acts against others are relevant if there is a sufficient nexus between the evidence sought to be introduced and the elements of the crime charged." In the present case, there is no such nexus. The prior acts of violence allegedly occurred eight years before the charged offense and involved a different victim. We also believe that whatever probative value this evidence had, if any, was substantially outweighed by the danger of unfair prejudice. *See* M.R.Evid. 403.

### III. *Prosecutorial Misconduct*

Although we vacate the convictions based on the error discussed above, we address the issue of prosecutorial misconduct for guidance of the court and counsel in the event of retrial. *State v. Reilly*, 446 A.2d 1125, 1130 (Me.1982).

■ On four occasions the State asked Bourgeois whether other witnesses had lied.[8] Recognizing that his trial counsel failed to object to these questions, Bourgeois on appeal contends that they amount to obvious error. *See* M.R.Crim.P. 52(b). An obvious error is "a seriously prejudicial error tending to produce manifest injustice." *State v. True*, 438 A.2d 460, 467 (Me.1981) (quoting *State v. Baker*, 409 A.2d 216, 219 (Me.1979)).

Contrary to the State's contention that the State's questions were proper, "[c]ross-examination that tries to push a defendant into saying other witnesses lied is *impermissible*." *State v. Steen*, 623 A.2d 146, 148 (Me. 1993) (quoting *State v. Commeau*, 409 A.2d 247, 249 n. 1 (Me.1979)). In *State v. Tripp*,

634 A.2d 1318, 1320 (Me.1994), we held that the prosecutor's cross-examination of the defendant about whether the victim lied was obvious error.

In the present case, we likewise conclude that the State's questions were improper. Because we are vacating the convictions based on the error discussed above, we need not determine whether the misconduct rises to the level of obvious error. We do, however, caution prosecutors from using this tactic in their cross-examinations and remind them that they are held to a high standard—to insure that each defendant is afforded a fair trial and that justice is done. *State v. Collin*, 441 A.2d 693, 697 (Me.1982).

The entry is:

Judgments vacated. Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.

---

8.  Q. You didn't threaten to take Cathy into the woods and kill her?
    A. No, sir.
    Q. She made that up?
    A. Yes, sir.
    ....
    Q. You didn't threaten [Cathy]? If she told anybody, she was dead, right?
    A. No.
    Q. She made that up?
    A. If that's what she said, she made it up.
    Q. Well, you heard her testimony?

A. I'm not sure exactly everything she said, so I'm just kind of being prompted by you.
....
    Q. So if [Cathy] told the jury she normally wears her seat belt, she's not telling the truth?
    A. If that's what she said.
....
    Q. [You made no] threats to kill [Rosalie]? No physical violence against her, right?
    A. That's correct.
    Q. Those are all lies?
    A. Yes. That's true.