STATE OF NEBRASKA, APPELLEE, V.
KIMBERLY SUE FAUST, APPELLANT.
660 N.W.2d 844

Filed May 9, 2003.   No. S-01-615.

James R. Mowbray and Jeffery A. Pickens, of Nebraska Commission on Public Advocacy, and Timothy W. Nelsen, Otoe County Public Defender, for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

A jury convicted the appellant, Kimberly Sue Faust, of two counts of first degree murder and two counts of use of a firearm to commit a felony. The district court sentenced her to consecutive terms of life imprisonment on each count of murder and 20 to 40 years' imprisonment for each count of use of a firearm to commit a felony.

Faust argues that the district court erred by (1) allowing prosecution witnesses to testify about specific instances of conduct when she acted aggressively or violently to rebut her character witnesses' testimony that she is a peaceful person, (2) instructing the jury on self-defense when it was not her theory of the case, (3) admitting into evidence photographs of the victims depicting them before their deaths, and (4) failing to hold a hearing to determine whether a statement that a police officer overheard her make to her father was voluntary. She also argues that she was denied effective assistance of counsel to the extent her trial counsel failed to address the issues now complained of on appeal, that there was prosecutorial misconduct, and that cumulative errors denied her due process.

We determine that under Neb. Rev. Stat. §§ 27-404 and 27-405 (Reissue 1995), the State is prohibited from introducing evidence of specific instances of a defendant's prior bad acts to rebut testimony of the defendant's character witnesses. We also address additional areas of concern about the performance of the attorneys involved at trial. Because the jury was exposed to a significant amount of improper and prejudicial testimony, we conclude that the district court erred in allowing the testimony Faust objected to and that she was denied effective assistance of counsel in the instances when her counsel did not object. We further conclude that because of the overwhelming prejudice to Faust's right to a fair trial, the convictions must be reversed and the cause remanded for a new trial.

## BACKGROUND

On April 25, 2000, Shannon Bluhm and Robert Parminter were killed on an Otoe County road. Faust was later charged in the deaths. Faust's theory of defense was that her husband, Bruce Faust, killed Shannon and Robert.

STATE'S EVIDENCE

On the evening of April 25, 2000, Desiree Parminter, Robert's wife, heard screaming and a horn honking outside of her home in Otoe County. She looked out the window and saw the taillights of a car. She told Robert about the incident, and he went to the front porch. At that time, Desiree saw a pickup truck drive by. Robert, thinking nothing had happened, went back to bed, but Desiree then saw a fire in the front driver's side of the car.

Desiree told Robert about the fire, and he went outside. She called the 911 emergency dispatch service and then also went outside. Robert yelled to her that he saw a four-wheel-drive vehicle. Desiree then saw a rectangular vehicle start up the road without its lights on and drive past the car that was on fire. She next saw Robert open the passenger door of the burning car and pull someone out. As Robert carried the person toward the house, Desiree saw the rectangular vehicle coming back with its headlights on. The vehicle stopped between Desiree and Robert, blocking her view. She then heard three or four "popping" sounds, and the vehicle drove off. She did not see any other people at the scene. She went inside and called the 911 number again.

When members of the Palmyra and Eagle rescue squads arrived on the scene around 10 p.m., they found the bodies of Robert and a female who was later identified as Shannon. Shannon's car, a white Geo Prism, was engulfed in flames. The record shows that Shannon had been dating Faust's husband, Bruce. Bruce and Faust were separated, but still married, on April 25, 2000.

The pathologist who performed the autopsies testified that Robert died of at least two gunshot wounds to the head. Shannon had stab wounds to both the left and right areas of the chest, a gunshot wound to the back of the head, and a gunshot wound to the back. The gunshot wound to the back was the fatal wound. A forensic pathologist testified that Shannon had "defensive wounds" that were caused by a weapon such as a knife or a blade.

The State's evidence shows that on April 25, 2000, Faust loaded her bicycle into the back of her vehicle, a Jeep Cherokee, and drove it to a county road near a paved highway. Faust then rode the bicycle into Eagle, Nebraska. According to Faust, her plan was to leave the bicycle in Eagle and obtain a ride back to

her Jeep from her cousin. Faust, however, encountered Shannon in Eagle and accepted Shannon's offer to drive her back to her Jeep. Faust and the State dispute what took place after Shannon and Faust drove back to the Jeep.

The State presented evidence showing that sometime before April 25, 2000, Faust's father, William Borden, gave Faust a loaded revolver because there was criminal activity in the area and he was concerned about her safety. Borden stated that on April 25, Faust called him and asked him to come to her house because she had a problem. When he arrived, Borden found Faust sitting at a picnic table, crying. She said that she had gone for a bicycle ride and that Shannon gave her a ride back to her Jeep. She said that after getting in the car, Shannon started cussing and calling her names. Faust told Borden that Shannon hit her and pulled her hair and that she hit Shannon back. Faust said that she and Shannon then scuffled outside the car, that Shannon had a knife, and that Shannon got "cut or stuck" by the knife. Faust told Borden that she next got into her Jeep and got the gun, that then someone grabbed her, and that the gun went off inside the Jeep. When she got home, she placed the gun in a freezer in her garage. Faust later gave Borden the gun, and he placed it in his truck. Borden also observed a bullet hole in the glove compartment of the Jeep. At about 3 a.m. on April 26, Joel Bergman, a criminal investigator with the Nebraska State Patrol, arrived at Faust's residence and stated that he was investigating a double homicide. Borden gave the gun to Bergman.

While he was at Faust's residence, Bergman overheard a conversation between Borden and Faust. Borden indicated that the situation was his fault because he had discouraged Faust from moving away. Faust replied, "It's not your fault, it's my doing."

Ashley Faust, Bruce and Faust's daughter, testified that Faust was wearing a gray sweatshirt when she left the house on April 25, 2000, and that when she returned at about 10 p.m., Ashley saw Faust go into the bathroom and change clothes. Ashley gave a gray sweatshirt to Bergman. The sweatshirt was later determined to have bloodstains on it, but investigators were unable to obtain a DNA sample from it. According to Ashley, Faust had been upset about a romantic relationship between Shannon and Bruce.

Bergman later arrested Faust and searched her residence. As a result of the search, Bergman found blood on Faust's Jeep and on a notebook on the front passenger seat. An arson investigator found scissors and a serrated knife blade in Shannon's car. A key that fit Faust's Jeep was found at the crime scene.

Blood samples from Faust's Jeep and the notebook were tested. The results showed that blood on the Jeep passenger door, driver's-side door, and driver's-side passenger door came from Robert. Blood from the notebook, the bottom of the driver's-side passenger door, and the driver's-side seat came from Shannon. Blood from the inside driver's-side ledge came from more than one person, with Shannon as a major contributor. Bullet fragments recovered from Robert's body and bullets recovered from Shannon's body were fired by the gun that Faust had in her possession on April 25, 2000.

Various witnesses testified that they saw a vehicle parked on the side of the road on April 25, 2000. One witness, who was driving a Chevrolet pickup, saw a Jeep Cherokee and a white car on the side of the road near the Parminters' home at about 9:35 p.m. The windows of the car were steamed up, and as he drove by, someone partially opened the door.

## FAUST'S EVIDENCE

Faust testified that on April 25, 2000, she parked her car off the highway because she was afraid Bruce would see it and she did not want him to find her. She testified that when Shannon drove her to her Jeep, Bruce pulled up and got in Shannon's car with them. According to Faust, a struggle took place between Bruce and Shannon, and in the process, Faust got hit in the eye. She stated that at one point, Bruce opened the car door and she saw a truck drive by. She testified that she got out of the car and went to her Jeep and that she had blood on her leg. She stated that she had the gun in the glove compartment of the Jeep because she was intending to return it to Borden. She got the gun out, it went off, and then she saw Shannon's car on fire. She went back to where the car was on fire, and Bruce was there. According to Faust, Bruce grabbed her and the gun went off. She testified that Bruce then tried to shoot her, but the gun would not work. She stated that Bruce threatened her not to tell

anyone and that when she went home, she did not think anyone was dead. Faust said that she wore a red sweatshirt on the night of the murders. She also stated that she had her Jeep keys tied to her shoelaces and that Bruce had a key to her Jeep.

The defense presented evidence that a passenger in the Chevrolet pickup which had driven by the white car had previously stated that when he saw the passenger door of the car open, he saw what he assumed to be a man's arm. The defense also presented evidence that the relationship between Bruce and Shannon had "cooled off" by April 2, 2000, and that Bruce had a history of acting violently. Faust also called various character witnesses.

After Faust presented her defense, the State called several rebuttal witnesses. The testimony of Faust's character witnesses, the rebuttal witnesses, and other pertinent facts are described in the analysis section of this opinion.

### INSTRUCTIONS AND CLOSING ARGUMENTS

Faust was not present at the instruction conference, but no objection was made about her absence. At the instruction conference, Faust's attorney noted that the court had decided to give a self-defense instruction for the charge involving Shannon. Faust's attorney then requested a self-defense instruction for the charge involving Robert. The court denied the instruction because there was no evidence of self-defense in Robert's death.

At closing arguments, the State, during its rebuttal argument, pointed out Faust's character trait for violence and brought out specific incidents of her violent and aggressive conduct that are detailed later in this opinion. The jury convicted Faust on all counts, and Faust was sentenced to consecutive terms of life imprisonment on each count of murder and 20 to 40 years' imprisonment for each count of use of a firearm to commit a felony. Faust appeals.

### ASSIGNMENTS OF ERROR

Faust assigns, rephrased, that the district court erred by (1) admitting into evidence proof of specific instances of Faust's conduct and allowing the prosecutor to argue inferences drawn from that conduct, (2) allowing the prosecutor to cross-examine Faust's

daughter, Ashley, about specific instances of Faust's conduct, (3) allowing the prosecutor to inquire into Ashley's reasons for wanting to live with Bruce and impeaching her with a letter she wrote, (4) instructing the jury on self-defense, (5) admitting into evidence photographs of the victims that were taken when they were alive, (6) asking Desiree whether Robert had had the injuries depicted in a postdeath photograph when he left the house on April 25, 2000; (7) admitting into evidence Faust's statement "it's my doing," (8) admitting into evidence testimony concerning Borden's character for peacefulness and allowing the prosecutor to argue inferences based on that testimony, (9) conducting the jury instruction conference in Faust's absence, and (10) allowing cumulative errors that denied Faust due process.

Faust also assigns that to the extent her trial counsel waived any of her assignments of error, she was denied effective assistance of counsel. She also assigns that the record suggests further instances of ineffective assistance of counsel. Finally, she assigns that each issue constituted prosecutorial misconduct.

## STANDARD OF REVIEW

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002); *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001). Other standards of review are included in our analysis of the issues.

## ANALYSIS

### EVIDENCE OF FAUST'S CHARACTER

Faust contends that the district court erred by allowing the prosecution to present evidence of specific instances of violent conduct to rebut her character witnesses' testimony that she is a peaceful person. She further argues that when her counsel did not object to the evidence, she was denied effective assistance of counsel. The State counters that it was entitled to prove specific instances of conduct that Faust had previously acted in a violent manner because she first presented evidence of her character for peacefulness.

## FAUST'S CHARACTER WITNESSES

Donna McCaugherty, a lay minister who had been counseling Faust, testified as a character witness for Faust. She stated that in her opinion, Faust is a very truthful and calm person. On cross-examination, the State asked McCaugherty if she was aware that Faust had previously pointed a gun at Bruce, had rammed her vehicle into a vehicle operated by Bruce, and had thrown tools and a steel milk crate at him. She stated that she was not aware of these incidents.

Bryan Kennedy, a friend of Faust, testified that Faust is a calm and pleasant person. He testified about an incident in which Bruce fired a gun over Faust's shoulder and she reacted in a calm manner. On cross-examination, the State asked Kennedy if he was aware that Faust had pointed a gun at Bruce. He was not aware of the incident. The State then asked if he was aware that Faust had rammed Bruce's vehicle with her vehicle. He stated that he had heard several versions of that story.

Diana Seip, Faust's sister, testified that in March 2000, Bruce physically abused Faust. She then heard Borden state that he would "bury" Bruce if he touched Faust again. Seip stated that she thought Borden would physically harm Bruce if he touched Faust one more time. She also testified that Faust is one of the most calm people she has ever known and that Faust is very truthful. On cross-examination, Seip was asked if she thought Borden was a peaceful person and she answered yes.

Borden stated that Faust is a peaceful person who tells the truth. On cross-examination, the State asked Borden if he is generally a peaceful person but can get frustrated enough to act out in violence. Borden answered yes.

Although Ashley did not testify about Faust's character for peacefulness, she did testify about instances when Bruce behaved in a violent manner. Ashley stated that Bruce once ran into her with his vehicle, that he hit her with a frying pan, and that he pointed a gun at Faust. Ashley also stated that Bruce once told Faust to shoot herself in the head. Ashley testified that on April 25, 2000, Bruce called the house while Faust was gone and she told him that Faust had gone on a bicycle ride.

Without objection, the State asked Ashley on cross-examination about a time when she had wanted to live with

Bruce. The State asked if one of the reasons she wanted to live with Bruce was because Faust "yelled and screamed at [her] all the time." Ashley replied that Faust did not yell but would get upset. The State also asked if another reason was because Faust lied about Bruce. Ashley answered "[n]o" and stated, "My mom does not lie to me." Without objection, the State then asked Ashley to read a letter she had written, which stated in part, referring to Faust: "She's always taking her anger out on me, always yelling and complaining, 24/7, all the time," and "she lies to my [probation officer] and counselor to make my dad look like the bad guy."

In her case in chief, Faust called Bruce as a witness and he admitted that he once became upset at Faust and acted aggressively. He admitted that he slammed a telephone down, causing it to come off of the wall, and that he slammed a door into a refrigerator, causing a dent. He denied ever pointing a gun at Ashley.

Faust testified about an incident when Bruce fired a gun over her shoulder. She also explained the incident in which she allegedly rammed her vehicle into Bruce's vehicle. She stated that he was driving in front of her and slammed on his brakes to cause her to hit him. She also discussed other instances when Bruce acted violently. Faust admitted that there were instances in which she was physically aggressive toward Bruce and that she thought the aggression "went both ways."

### STATE'S REBUTTAL EVIDENCE

On rebuttal, the State called several witnesses who testified about specific instances of Faust's violent conduct. Jeff Bluhm (Bluhm), Shannon's husband, testified that Faust called him at times when she knew Bruce and Shannon were together. He stated that Faust wanted him to become involved in breaking up Bruce and Shannon's relationship and that she once called him 10 times during the same night. He described the nature of the calls as a "very aggravated, furious type." He stated that he got a caller identification device and started screening calls because Faust called him so often. Faust's attorney stated "[o]bjection" at the beginning of Bluhm's testimony about the calls, but the record shows no discussion with the court about the objection or a ruling by the court.

Bluhm next testified about an incident when he went to pick up his and Shannon's children at Shannon's workplace and Faust abruptly drove up, hitting the curb with her vehicle. He stated that Faust got out of her vehicle as if she was "on a mission," briskly walked up to Shannon, and said, "What the fuck are you doing with my husband, you bitch?" Bluhm testified that the situation was "aggravated" and that he stepped between Shannon and Faust and told Shannon to go inside.

Faust's attorney objected to the testimony based on § 27-404. The State argued that the testimony was being offered under § 27-404(1) to rebut evidence about Faust's character for peacefulness. The court indicated that it did not think § 27-404(2) applied, and the State abandoned an argument that the evidence had independent relevance under § 27-404(2). In particular, the following conversation occurred:

> [Faust's attorney]: Your Honor, I believe [the State] is getting into some [§ 27-]404 materials that pursuant to that rule I think we're entitled to a hearing outside the presence of the jury.
>
> THE COURT: Well, let me figure out where we are. What's the testimony going to be . . . ?
>
> [The State]: That there was a confrontation where Kim Faust called Shannon Bluhm filthy names and started to physically approach her.
>
> THE COURT: Now, just so that I'm clear, are you offering this then under [§ 27-]404(1)A in rebuttal to the evidence put on with regard to her character trait of peacefulness? Is that what you're doing?
>
> [The State]: Yes, Your Honor, and also there was testimony by Kim Faust that there — that she had a couple of conversations and there never was any problems between her and Shannon. And I think it also goes to motive, because she's now testified that someone else did these crimes.
>
> THE COURT: Well, if we get into motive, you're down into [§ 27-]404(2), I think. If you're offering it —
>
> [The State]: Could I look at the specific rule?
>
> THE COURT: If you're offering it to rebut the testimony with regard to her character trait of being peaceful, then I don't think [§ 27-]404(2) and (3) apply, and I can just

merely give the jury an instruction, an instruction that it's being offered to rebut.

[The State]: Could I look at that specific rule, Judge? Yes, Your Honor, I didn't remember the rule number, but I'm offering this to show that . . . you're allowed to go into specific acts showing the character that's been offered to rebut that character.

THE COURT: Okay. Well, for that limited purpose, I'll permit the questioning.

Neither attorney nor the court discussed § 27-405. The court allowed the testimony and gave the jury a limiting instruction, which stated in part: "This testimony was received only to help you to decide whether you believe the testimony of [Faust]'s witnesses who testified with regard to [Faust]'s character for peacefulness, those witnesses being Donna McCaugherty, Bryan Kennedy, Diana Seip, and William Borden."

The State also called Bruce's friend, Gordon Lukes. Without objection, Lukes stated that in February 2000, he went to the Faust residence to help Bruce get some of his personal belongings. When Lukes pulled into the driveway, he saw Faust "kind of in a total rage, kicking and screaming and hollering and yelling." Lukes stated that Faust then yelled at him and told him to "get the fuck out of there because [he] was trespassing." He testified that Faust was kicking Bruce and using numerous profanities. Lukes stated that Faust also threw things at Bruce, including a steel milk crate, which hit Bruce in the back between the shoulder blades and then bounced up and over a truck. He described Faust's demeanor as an "uncontrolled rage." Lukes testified that Bruce was very calm during the incident. After the testimony, the court gave the jury a limiting instruction that was substantially the same as the instruction given after Bluhm's testimony.

On rebuttal, Bruce testified that Faust had purposely hit his vehicle with her vehicle. Without objection, Bruce also testified that in February 2000, Faust pointed a gun at him twice and that someone had to grab the gun away from her.

### Principles of Law

The ability of the State and the accused to present evidence of a character trait and the manner in which that evidence may be

presented is addressed by Neb. Rev. Stat. § 27-403 (Reissue 1995) and §§ 27-404 and 27-405.

Section 27-404 explains when character evidence is admissible and provides in part:

(1) Evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:

(a) Evidence of a pertinent trait of his or her character offered by an accused, or by the prosecution to rebut the same;

. . . .

(2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

Although § 27-404(1)(a) allows the accused to offer evidence of a pertinent trait of his or her character and allows the prosecution to rebut that evidence, § 27-405 limits the manner in which the evidence may be admitted. Section 27-405 provides:

(1) In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(2) In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

Section 27-403 may also serve to limit the use of character evidence. Under § 27-403: "Although relevant, evidence may be

excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

It is uniformly recognized that although the character of an accused often is relevant to the issue of his or her conduct on a particular occasion, character evidence is normally inadmissible for that purpose under § 27-404(1). See, *State v. Trotter*, 262 Neb. 443, 632 N.W.2d 325 (2001); *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999). See, e.g., *Freeman v. State*, 486 P.2d 967 (Alaska 1971); *Henson v. State*, 239 Ark. 727, 393 S.W.2d 856 (1965); *People v. Baskett*, 237 Cal. App. 2d 712, 47 Cal. Rptr. 274 (1965), *disapproved on other grounds, People v. Kelley*, 66 Cal. 2d 232, 424 P.2d 947, 57 Cal. Rptr. 363 (1967). See, generally, *Michelson v. United States*, 335 U.S. 469, 69 S. Ct. 213, 93 L. Ed. 168 (1948). In criminal cases, the State is prohibited from attempting to prove the guilt of the accused by initiating an attack on his or her character. See, e.g., *Freeman, supra.* Section 27-404(2) specifically prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner. *Sanchez, supra.*

Evidence of prior bad acts of an accused might still be admissible if it has independent relevance under § 27-404(2). But before the prosecution may offer other crimes evidence under § 27-404(2), it must prove to the trial court, out of the presence of the jury and "by clear and convincing evidence that the accused committed the crime, wrong, or act." § 27-404(3); *Sanchez, supra.* We further require that the prosecution clearly state the purpose for which the evidence is offered and that the court must state the purpose for which it is received. *Sanchez, supra.* Any limiting instruction must " ' "clearly, simply, and correctly" instruct the jury as to the *specific* purpose for which [it] may consider the evidence.' " (Emphasis in original.) *Id.* at 308, 597 N.W.2d at 374. Here, the State did not attempt to prove to the court, outside the presence of the jury, that Faust's acts actually occurred. Instead, the State specifically abandoned any argument that the evidence had independent relevance and has not argued that § 27-404(2) applies to this case. The court did not hold a hearing or consider whether the evidence was admissible under

§ 27-404(2), and the jury was not instructed on § 27-404(2). Accordingly, we do not address whether any of the evidence might have been admissible under § 27-404(2). See, generally, *Sanchez, supra.*

The rule prohibiting the use of character evidence to prove conduct is not applied to the accused in criminal cases. It is consistently held that the accused may seek to establish his or her good character if proof is confined to particular character traits that are relevant to the conduct involved in the crime with which he or she has been charged. § 27-404(1)(a). See, e.g., *Freeman, supra.* It is equally established that once the accused presents evidence of his or her good character, the prosecution may rebut that evidence. *Id.*

Although § 27-404(1)(a) allows the accused to present character evidence and allows rebuttal by the prosecution, the manner in which either party may present the evidence is limited by § 27-405. Under § 27-405, proof by either party must be made by expressions of reputation or opinion, unless the character trait is an essential element of a charge, claim, or defense. § 27-405. See, e.g., *United States v. Herman,* 589 F.2d 1191 (3d Cir. 1978), *cert. denied* 441 U.S. 913, 99 S. Ct. 2014, 60 L. Ed. 2d 386 (1979). Here, a character trait for violence is not an element of the crime charged, nor did Faust assert a defense that required a character for peacefulness as an element.

When character is not an element of the crime or a defense, § 27-405 dictates that the only inquiry that can be made into specific instances of conduct is through cross-examination of the defendant's character witnesses. § 27-405; *State v. Bourgeois,* 639 A.2d 634 (Me. 1994); 2 Joseph M. McLaughlin, Weinstein's Federal Evidence § 405.03[2][a] (2d ed. 2003). See *State v. Eynon,* 197 Neb. 734, 250 N.W.2d 658 (1977). During cross-examination, the prosecutor is limited to an inquiry whether the witness has heard of a given fact, misdeed, or criminal conviction. See, e.g., *Michelson v. United States,* 335 U.S. 469, 69 S. Ct. 213, 93 L. Ed. 168 (1948); *United States v. Curry,* 512 F.2d 1299 (4th Cir. 1975), *cert. denied* 423 U.S. 832, 96 S. Ct. 55, 46 L. Ed. 2d 50; *United States v. Beno,* 324 F.2d 582 (2d Cir. 1963); *Bourgeois, supra*; *State v. Kelly,* 102 Wash. 2d 188, 685 P.2d 564 (1984) (en banc). The inquiry is not intended to act

862

as proof that the conduct occurred. Rather, it is intended to test the basis of the witness' opinion or his or her knowledge of the defendant's reputation. See, *State v. Williams*, 111 Ariz. 511, 533 P.2d 1146 (1975); *Bourgeois*, 639 A.2d at 637 n.7, quoting Richard H. Field & Peter L. Murray, Maine Evidence § 405.2 (3d ed. 1992) ("'objective of cross-examination of a character witness for an accused is to show an inadequate basis for the reputation to which the witness has testified on direct'"). See, also, *Kelly*, 102 Wash. 2d at 194, 685 P.2d at 569 ("primary purpose of [character witnesses'] cross examination must be to impeach the testimony of the character witnesses, not to discredit the person on trial").

█ Because cross-examination questions and responses are not allowed as proof that the act occurred and are instead meant to test the witness' knowledge, the prosecution must accept the answer given by the witness. Thus, if the witness states that he or she is not aware of the act asked about, the prosecution may not prove that the act occurred through other witnesses or with extraneous evidence. See, e.g., *Bourgeois, supra*; *State v. O'Neal*, 432 A.2d 1278 (Me. 1981). This rule also applies to the direct examination of rebuttal witnesses. See, e.g., *Curry, supra*; *Beno, supra*; *Freeman v. State*, 486 P.2d 967 (Alaska 1971); *Henson v. State*, 239 Ark. 727, 393 S.W.2d 856 (1965); *People v. Baskett*, 237 Cal. App. 2d 712, 47 Cal. Rptr. 274 (1965), *disapproved on other grounds, People v. Kelley*, 66 Cal. 2d 232, 424 P.2d 947, 57 Cal. Rptr. 363 (1967); *Bourgeois, supra* (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 405[02] (1993)); *People v Champion*, 411 Mich. 468, 307 N.W.2d 681 (1981). See, also, *Kelly, supra* (in dicta). See, generally, *Williams, supra*; *O'Neal, supra*. The rule's intent is to counter the concern that extraneous evidence of specific instances of conduct has the potential to be confusing to the jury and overly prejudicial to the defendant.

In *Bourgeois, supra*, a rebuttal witness testified about the defendant's specific past acts of violence to rebut the testimony of character witnesses about his reputation for peacefulness. Because of the improper use of evidence of specific instances of conduct, the Supreme Court of Maine reversed the conviction. The court explained:

Unless character is an essential element of the offense charged, the only inquiry that can be made into specific instances of conduct is, as [Maine Rules of Evidence] 405(a) provides, through cross-examination of the character witness.

. . . .

"The reason for the rule of exclusion lies in the tendency of triers of fact to give excessive weight against the accused respecting any specific illegal activity. It further tends to confuse the jury concerning the main issue of guilt or innocence of the offense charged and calls upon the accused to account for past wrongdoings for which he is not being tried. The main thrust of such evidence, such as other unrelated wrongful acts of the accused, is to pollute the minds of the jury against the defendant. . . . 'If such testimony should be admitted, the defendant might be overwhelmed by prejudice, instead of being tried upon the evidence affirmatively showing his guilt of the specific offense with which he is charged.'" *City of Topeka v. Harvey*, [188 Kan. 841, 365 P.2d 1109 (1961)].

*State v. Bourgeois*, 639 A.2d 634, 637 (Me. 1994). See, also, *Freeman, supra* (discussing reasons for rule); *Henson, supra* (admission of specific instances of conduct to prove character raises collateral issues and diverts minds of jurors from matter at hand).

▪ Under § 27-405, the prosecution's rebuttal witnesses may testify only to reputation or opinion. The witnesses may not be used to prove that specific instances of conduct occurred. See, *United States v. Curry*, 512 F.2d 1299 (4th Cir. 1975), *cert. denied* 423 U.S. 832, 96 S. Ct. 55, 46 L. Ed. 2d 50; *United States v. Beno*, 324 F.2d 582 (2d Cir. 1963); *Freeman, supra*; *Henson, supra*; *Baskett, supra*; *Bourgeois, supra*; *Champion, supra*. See, also, *Kelly, supra* (in dicta). See, generally, *State v. Williams*, 111 Ariz. 511, 533 P.2d 1146 (1975); *O'Neal, supra*.

▪ Section 27-405 limits the defendant's evidence of character to evidence of opinion or reputation. But even when a defendant improperly offers specific instances of his or her good conduct, the prosecution may not counter by offering evidence of specific instances of bad conduct. *United States v. Herman*,

589 F.2d 1191 (3d Cir. 1978), *cert. denied* 441 U.S. 913, 99 S. Ct. 2014, 60 L. Ed. 2d 386 (1979); *Beno, supra; Henson v. State,* 239 Ark. 727, 393 S.W.2d 856 (1965). See *People v. Baskett,* 237 Cal. App. 2d 712, 719, 47 Cal. Rptr. 274, 279 (1965) (character witness' testimony, "whether properly received or not," did not open door to rebuttal witness' testimony about specific instances of conduct). As one court stated:

> [I]t makes little sense to insist that once incompetent evidence is erroneously admitted, the error must of necessity be compounded by "opening the door" so wide that rebutting collateral, inflammatory and highly prejudicial evidence may enter the minds of the jurors. In short, a small advantage improperly obtained does not compel the exaction of a gross disadvantage in penalty, particularly where a tarnished verdict is the inevitable result.

*Beno,* 324 F.2d at 588-89. See, also, *Henson,* 239 Ark. at 732, 393 S.W.2d at 859 ("two wrongs do not make a right"). See, generally, *Freeman v. State,* 486 P.2d 967, 976 (Alaska 1971) ("door to rebuttal once opened must not be broadened into a gateway to jury prejudice").

A defendant can "open the door" to proof of specific instances of conduct if he or she testifies and makes specific claims about specific instances of his or her past conduct. In that circumstance, evidence of specific instances of conduct by rebuttal witnesses may be admissible to directly contradict the specific claims of the accused. *Freeman, supra; Henson, supra.*

### APPLICATION TO FAUST'S CASE

We now address testimony of specific instances of conduct presented in Faust's case that are raised on appeal. We note at the outset that Faust presented four character witnesses who testified that in their opinion, she was a peaceful person. At least one was allowed to testify about a specific instance of Faust's peaceful behavior.

### JEFF BLUHM

The State called Bluhm as a rebuttal witness. Bluhm testified about an incident when Faust drove up, hitting the curb with her vehicle; approached Shannon in a threatening manner as if she was "on a mission"; and called her a "bitch." Faust's attorney

objected to the testimony. The prosecution stated that the evidence was being used solely to rebut Faust's character for peacefulness. The court allowed the testimony for that purpose only and gave a limiting instruction.

The court erred in allowing the testimony. The law is clear that the prosecution cannot prove specific instances of conduct through extrinsic evidence. Instead, the prosecution was limited to cross-examination of Faust's character witnesses about whether they had knowledge of instances in which Faust behaved in a nonpeaceful manner.

The State contends that by presenting evidence of her own good character and by testifying about a specific instance of good character, Faust opened the door to proof of specific instances of conduct on rebuttal. We disagree. Under § 27-405, the State must limit its rebuttal of statements made by character witnesses to cross-examination and must accept the answers provided by the witnesses. Courts have repeatedly stated concerns about the inflammatory and prejudicial nature of testimony about specific acts of bad conduct, and § 27-405 is formulated to address those concerns.

The State also argued to the trial court that Faust stated there was never any problem between her and Shannon and that the testimony was admissible to rebut that statement. But the record does not support the State's argument, and the court did not allow the evidence for that purpose. Further, an inquiry into specific instances of conduct on rebuttal is allowed only to rebut a defendant's denial of a specific occurrence.

Here, the State chose to prove on rebuttal that the incident actually occurred, which is not allowed. Further compounding the error is that none of Faust's character witnesses were asked on cross-examination about the specific instance when Faust got out of her car and approached Shannon in a threatening manner. Yet Bluhm was asked about that incident on rebuttal. The evidence would not be admissible even if Faust's witnesses had denied knowledge of the acts on cross-examination, but that they were never asked makes the State's argument that the evidence was necessary for rebuttal irrelevant.

Bluhm's testimony served to show only that Faust has a bad character trait for violence and acted in conformity with that

character on April 25, 2000, which is inadmissible under § 27-404(1). Evidence of a criminal defendant's prior instances of conduct may not be admitted solely to show propensity. Here, the State presented the evidence solely to rebut Faust's character witnesses, which is not permitted under § 27-405(1). The jury was then instructed that it could consider the evidence for a purpose that is not allowed by § 27-405. Indeed, the instruction, when it informed the jury that the evidence could be used to determine if they believed Faust's character witnesses, allowed the jury to consider improper evidence of propensity to reach that determination. If the jury believed Faust had a propensity for violent behavior, they would likely not believe her character witnesses. This is specifically what §§ 27-404(1) and 27-405 prohibit. See *Sanchez, supra.* Accordingly, the trial court erred when it allowed Bluhm to testify about specific instances of Faust's conduct.

### UNOBJECTED-TO REBUTTAL TESTIMONY

Faust also complains about testimony that was not objected to at trial. We first address instances of unobjected-to rebuttal testimony and then address unobjected-to questions asked during cross-examination. Finally, we address whether Faust's counsel was deficient for failing to object.

During the State's rebuttal, the following testimony was unobjected to or not objected to with sufficient specificity: (1) Bluhm testified about harassing telephone calls he received from Faust that he described as a "very aggravated, furious type"; (2) Lukes testified about an incident when Faust yelled at him and told him to "get the fuck out" because he was trespassing; (3) Lukes also testified that Faust screamed and yelled at Bruce, kicked him, threw a steel milk crate at him, hitting him in the back between the shoulder blades, and was in "an uncontrolled rage"; (4) Bruce testified that Faust pointed a gun at him twice and that someone had to grab the gun away from her; and (5) Bruce testified that Faust had purposely hit his vehicle with her vehicle.

Faust's attorney did not object to the testimony. A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Harms,* 263 Neb. 814, 643

N.W.2d 359 (2002), *modified on other grounds* 264 Neb. 654, 650 N.W.2d 481; *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). Faust may, however, raise a claim of ineffective assistance of counsel because of the failure of her counsel to object. See, generally, *State v. Hansen*, 252 Neb. 489, 562 N.W.2d 840 (1997). We first address whether the testimony was inadmissible. If the testimony is inadmissible, we then address whether Faust was denied effective assistance of counsel.

Bruce's testimony on rebuttal that Faust purposely hit his vehicle with her vehicle was admissible. Faust previously testified and specifically denied that she purposely hit Bruce's vehicle. Thus, Bruce could testify about the incident to rebut Faust's specific testimony about what happened in that specific instance. The rest of the testimony, however, was inadmissible and should have been objected to.

There were no objections to the testimony about the telephone calls, and this testimony was also inadmissible. The State could not inquire about specific instances of conduct on rebuttal. Further compounding the problem, Faust's character witnesses were not asked if they had knowledge of the telephone calls.

There should also have been objections to Lukes' testimony. Although some character witnesses were asked if they were aware that Faust had thrown tools and a steel milk crate at Bruce, the State was required to accept the witnesses' answers and could not seek on rebuttal to prove that the conduct occurred. Further, Faust admitted during her direct examination that she sometimes behaved aggressively toward Bruce. Thus, even if the State were allowed to rebut through instances of specific conduct—which it was not—it had nothing to rebut. Faust had already admitted to behaving aggressively toward Bruce. The State could not seek to expand on that admission by introducing numerous instances of Faust's violent conduct, which the rules prohibit to avoid jury prejudice and confusion. We note that Lukes testified that Bruce behaved in a calm manner during the incident, but the evidence was not admitted for that purpose, and we do not address whether it would be admissible for that purpose.

Finally, Bruce's testimony that Faust had pointed a gun at him was also inadmissible. As with other instances of rebuttal

testimony, the error was compounded because Faust had admitted that she had behaved aggressively toward Bruce.

The State is prohibited from using specific instances of conduct to prove character when the issue of character is circumstantial to the case. The rebuttal testimony was inadmissible.

### UNOBJECTED-TO CROSS-EXAMINATION

Ashley did not provide character evidence for Faust during her direct examination. The State, however, cross-examined Ashley about specific instances of conduct, asking her if Faust "yelled and screamed at [her] all the time" and if Faust lied. When Ashley answered no, the State impeached her with a letter she wrote stating that Faust "yell[ed] and complain[ed] . . . all the time." There was no objection.

The State's cross-examination of Ashley was improper. Had Ashley provided character evidence, the State could have asked her if she was aware of certain instances of conduct to test her knowledge as a witness. The State would then be required to accept her answer. Here, Ashley did not provide any character testimony. Not only was the State barred from using extrinsic evidence to prove that specific instances of conduct occurred, it was barred from engaging in cross-examination about the conduct. The State's cross-examination questions about Faust's character were inadmissible. The impeachment based on Ashley's answers to the questions further compounded the error. Because the State's initial questions were improper, the impeachment should never have occurred. But even if the State had been able to ask cross-examination questions about Faust's character, it would be required to accept the answer given by the witness.

### HARMLESS ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL

We next address whether the unobjected-to errors deprived Faust of effective assistance of counsel and whether admission into evidence of the objected-to testimony was harmless error.

Faust brings her claim of ineffective assistance of counsel on direct appeal. But such a claim need not be dismissed merely because it is made on direct appeal. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995). See *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002), *cert. denied* 537 U.S. 918, 123

S. Ct. 303, 154 L. Ed. 2d 203. The determining factor is whether the record is sufficient to adequately review the question. *Cody, supra*. If the matter has not been raised or ruled on at the trial level and requires an evidentiary hearing, an appellate court will not address the matter on direct appeal. *Id.*

To establish a right to relief because of a claim of ineffective counsel at trial or on direct appeal, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. See, *Thomas, supra*; *State v. Becerra*, 261 Neb. 596, 624 N.W.2d 21 (2001).

To prove prejudice, the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Boppre*, 252 Neb. 935, 567 N.W.2d 149 (1997), *disapproved on other grounds, State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998). When a defendant challenges a conviction, the question is whether there is a reasonable probability that absent the errors, the fact finder would have had a reasonable doubt concerning guilt. *Id.*

The U.S. Supreme Court has explained:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Strickland*, 466 U.S. at 695-96. Accord *Boppre, supra*. In particular, the Court has stated that although these principles should

guide the decision, "*the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.*" (Emphasis supplied.) *Strickland*, 466 U.S. at 696. As the Court has noted, "[i]n every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*

We conclude that by failing to object to a significant amount of improper negative character evidence, Faust's counsel's performance was deficient and prejudiced her defense. This is true even though she also improperly offered a specific instance of conduct to show her character for peacefulness. One court has described the prejudice that arises as follows:

> [A] criminal defendant is entitled to have his guilt or innocence determined on the specific offense charged and not risk the possibility of conviction for a series of prior specific acts which collectively suggested that his career had been reprehensible. The force of this principle, which lies at the heart of our criminal law system and seems a vital part of our definition of due process of law, is in no way blunted merely because a defendant has, in seeking acquittal, introduced evidence of less than questionable relevance. While there are instances in which a defendant may waive rights which the law invokes for his protection . . . the right to be tried for a specific offense, as the very foundation of a criminal trial as we know it, cannot be one of them.

*United States v. Beno*, 324 F.2d 582, 589 (2d Cir. 1963).

Because Faust's counsel failed to object to the testimony, the State was able to parade before the jury a series of witnesses whose testimony was not only inadmissible but also prejudicial. Although presented as "rebuttal testimony," the effect of the testimony was to demonstrate to the jury, over and over again, that Faust was a violent and aggressive person, and as such, that she had a propensity to commit the crime and should be convicted. Our jurisprudence does not allow this. See *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999).

When a jury is presented with inadmissible evidence that is inflammatory and has a high potential for jury confusion, we

cannot determine whether the defendant was convicted for committing the elements of the crime charged or whether the jury determined guilt because the defendant was a generally aggressive or violent person and, thus, more likely to commit the crime. See *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988) (improper testimony about defendant's character was not harmless error). When improper evidence of a defendant's prior bad acts is involved, the probability that the improper evidence unduly influenced the jury and denied the defendant a fair trial is so great that courts, using terms such as "serious prejudice" and "manifest injustice," overwhelmingly hold that the error is not harmless. See, *United States v. Pantone*, 609 F.2d 675 (3d Cir. 1979); *United States v. Herman*, 589 F.2d 1191 (3d Cir. 1978), *cert. denied* 441 U.S. 913, 99 S. Ct. 2014, 60 L. Ed. 2d 386 (1979); *United States v. Curry*, 512 F.2d 1299 (4th Cir. 1975), *cert. denied* 423 U.S. 832, 96 S. Ct. 55, 46 L. Ed. 2d 50; *Beno, supra*; *Sun B. Lee v. United States*, 245 F.2d 322 (9th Cir. 1957); *State v. Williams*, 111 Ariz. 511, 533 P.2d 1146 (1975); *Henson v. State*, 239 Ark. 727, 393 S.W.2d 856 (1965); *People v. Dee*, 14 Ill. App. 2d 96, 142 N.E.2d 811 (1957); *State v. O'Neal*, 432 A.2d 1278 (Me. 1981); *State v. Putzell*, 40 Wash. 2d 174, 242 P.2d 180 (1952).

Here, the jury should not have heard on rebuttal that Faust made numerous harassing telephone calls to Bluhm, that she had previously approached Shannon in a threatening manner and called her names, that she yelled at Lukes and used profanity, that she threw items at Bruce and called him names, and that she previously pointed a gun at Bruce. The jury heard Faust's telephone calls described as a "very aggravated, furious type." They also heard Faust described as being in an "uncontrolled rage" during one of the incidents. They then heard that she behaved as if she was "on a mission" during another. As we and other courts have recognized, even a small amount of such evidence is highly inflammatory and can serve only to confuse the jury about the issues in the case and affect their deliberations. See, e.g., *Curry*, 512 F.2d at 1304 (evidence that defendant " '[a]bout a year ago . . . was dealing in drugs' " was not harmless error); *Lenz, supra* (evidence of two instances of improper conduct was not harmless error). Further, the jury heard Ashley read a letter in which

she wrote that Faust yelled, complained, and screamed "24/7, all the time," and that Faust lied about Bruce to make him look bad. Thus, the jury was improperly allowed to hear evidence that Faust lied about Bruce. This evidence could influence the jury to believe that if Faust lied about Bruce once, she would have the propensity to lie about him again at trial when she placed the blame on him for the murders.

Here, there were numerous instances of conduct that likely polluted the jury. During the State's rebuttal argument, the prosecutor spoke about Faust's character for peacefulness and argued that she was not peaceful based on the incidents where Faust threw a steel milk crate, called Shannon a "bitch," made telephone calls to Bluhm, and pointed a gun at Bruce. There were no objections, and because the arguments were made on rebuttal, Faust's counsel could not respond to them. The total effect of the errors was that the State was able to spend the last portion of the trial presenting evidence of numerous specific instances of Faust's violent behavior and then use that to argue Faust's guilt to the jury. Thus, the testimony was at the end of the trial where it was fresh in the juror's memories and wafted an unwarranted innuendo into the jury box just before the jury entered deliberations. See *Michelson v. United States*, 335 U.S. 469, 69 S. Ct. 213, 93 L. Ed. 168 (1948). Here, where the jury was wrongly allowed to hear so many specific instances of conduct, Faust was deprived of a fair trial in a most fundamental manner.

The State, however, contends that we are unable to review the issue of ineffective assistance of counsel on direct appeal because the record is incomplete for a review of the question. We disagree. It is clear from the record that the trial court and attorneys involved in this case failed to read and understand § 27-405. As a result, Faust's counsel initially objected to improper character evidence and then failed to continue to object as more prejudicial evidence was piled on. Here, Faust's attorney, along with the prosecutor and the court, made a fundamental mistake of law. The situation was not one where a reasonable trial tactic or strategy was employed, and indeed, no strategy could be reasonable when the result would be a fundamentally unfair trial.

It is correct that we have stated that when considering whether a counsel's performance was deficient, there is a strong

presumption that counsel acted reasonably. See, e.g., *State v. Zarate*, 264 Neb. 690, 651 N.W.2d 215 (2002). But this presumption can be rebutted, and relief may be warranted without an evidentiary hearing when a decision by counsel cannot be justified as a result of a plausible trial strategy. *Jackson v. Leonardo*, 162 F.3d 81 (2d Cir. 1998).

Although we have not reversed a conviction on direct appeal for ineffective assistance of counsel for failure to object to prejudicial evidence, other jurisdictions have recognized that in some rare circumstances, a reasonable trial tactic or strategy cannot exist. In these cases, courts have reversed for ineffective assistance of counsel on direct appeal. See, e.g., *Com. v. Scullin*, 44 Mass. App. 9, 687 N.E.2d 1258 (1997); *Com. v. Gillette*, 33 Mass. App. 427, 600 N.E.2d 1009 (1992); *State v. Cutcher*, 17 Ohio App. 2d 107, 244 N.E.2d 767 (1969); *Stone v. State*, 17 S.W.3d 348 (Tex. App. 2000). See, also, *State v. Roybal*, 132 N.M. 657, 54 P.3d 61 (2002) (finding no reasonable trial strategy for failure to object, but determining that defendant was not prejudiced). See, generally, *People v. Guizar*, 180 Cal. App. 3d 487, 225 Cal. Rptr. 451 (1986) (applying plain error); *Broussard v. State*, 68 S.W.3d 197 (Tex. App. 2002) (Cohen, J., dissenting). In the federal courts, some circuits, including the Eighth Circuit, will reverse for ineffective assistance of counsel in the absence of an evidentiary hearing when there is no plausible explanation for counsel's actions. *Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001). See, also, *Leonardo, supra*. In particular, the U.S. Supreme Court recently noted that "[t]here may be cases in which trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal. There may be instances, too, when obvious deficiencies in representation will be addressed by an appellate court *sua sponte*." *Massaro v. United States*, No. 01-1559, 2003 WL 1916677 at *6 (U.S. Apr. 23, 2003).

When reversing a judgment for ineffective assistance of counsel without an evidentiary hearing for failure to object to evidence, appellate courts have considered the lack of a plausible strategy, the egregious nature of the error, the prejudice incurred, the effect of judicial errors, and the effect of other trial errors. See, e.g., *Scullin, supra; Gillette, supra; Cutcher, supra*. For example,

in *Gillette*, the defendant was charged with indecent assault and battery of his daughter. At trial, evidence was admitted without objection that years earlier, while his wife was pregnant with another child, the defendant told his wife that if she had a daughter, he would take away the child's virginity. The jury heard the statement from three separate witnesses, and it was emphasized in both the prosecutor's opening and closing arguments. On appeal, the court noted that " '[t]rial tactics which, from the vantage point of hindsight, can be seen to have failed do not amount to ineffective assistance unless "manifestly unreasonable" when undertaken.'" *Gillette*, 33 Mass. App. at 429, 600 N.E.2d at 1011. But the court also considered the egregious nature of the error and the prejudice that resulted. The court determined that the evidence was "highly prejudicial" and "unquestionably, any 'ordinary fallible lawyer' would have sought to keep it out of the case." *Id.* at 430, 600 N.E.2d at 1011. The court then concluded as a matter of law that the evidence was more prejudicial than probative. The court stated that no reasonable trial strategy to justify the failure to object had been offered and that it could not imagine any. As a result, the court reversed the conviction.

In *Cutcher, supra*, defense counsel in a sexual assault case initially elicited testimony from his client about previous arrests for incest, assault, and battery. The state stipulated that an exhibit related to the testimony could be entered into evidence. On appeal, the court expressed disappointment with both the defense and prosecuting attorneys, indicating that the state should not have facilitated the reception into evidence of such damaging and prejudicial evidence. The court then noted, however, that the harm to the defendant's right to a fair trial arose from the actions of his attorney, who chose to introduce the evidence "for whatever imagined tactical or strategic trial reason, it is impossible, from the record, to ken." *State v. Cutcher*, 17 Ohio App. 2d 107, 110, 244 N.E.2d 767, 769 (1969). The court considered the prejudicial effect of the evidence and the fact that if the evidence were admissible for another purpose, the jury "was in the dark about it." *Id.* at 111, 244 N.E.2d at 769. The court further noted additional errors that occurred at trial as "other examples of trial counsel's questionable efficiency." *Id.* Finally, the court noted that where the defense is substantially weakened

because of an unawareness of a rule of law basic to the case, the accused is denied effective assistance of counsel. As a result, the court reversed the conviction.

Here, it is clear from a review of the record that everyone was on the wrong page. When discussing the initial objection to Bluhm's testimony, the discussion centered on the meaning of § 27-404(1). It is clear from the record that the court and the attorneys stopped their inquiry after reading that under § 27-404(1), the prosecution could rebut Faust's character evidence. They then made a mistake of law when they failed to consider § 27-405 to determine that the evidence could not be rebutted using specific instances of conduct. We further note that had the law been determined correctly the first time the issue was raised, the problem we face in this case would not exist.

We are also unable to conceive of any reasonable trial strategy when defense counsel would choose to allow a continuing stream of witnesses to testify about numerous bad acts of the defendant when such evidence has such a high potential to prejudice the jury against the defendant. We further note that no plausible strategy has been offered. Perhaps counsel may have been concerned that continuing to object to the evidence would emphasize the evidence to the jury. But such a strategy is not reasonable when the objectionable testimony is so extensive and damaging. Further, counsel could have requested a continuing objection. Regardless, a defendant has a right to be tried for the specific offense charged, and this cannot be waived. *United States v. Beno*, 324 F.2d 582 (2d Cir. 1963). When the inadmissible evidence that is presented has such a high level for jury prejudice and confusion, there is no strategy or reason for a defense attorney to sit back and allow such evidence to be heard without objection. Simply put, when the error was so egregious and resulted in such a high level of prejudice, no tactic or strategy can overcome the effect of the error, which effect was a fundamentally unfair trial. In that rare case, a determination of the issue of ineffective assistance of counsel does not require an evidentiary hearing.

Finally, as discussed later in this opinion, there were other errors at trial. In particular, we note the failure of Faust's counsel to object to a self-defense instruction when self-defense was not

the theory of her case, and we note the failure to object to the use of victim photographs. Faust also raised issues about prosecutorial misconduct and the cumulative effect of trial errors.

We recognize that rarely will a reviewing court be provided the opportunity to make a determination of ineffective assistance of counsel on direct appeal when the issue involves a failure to object to prejudicial evidence. See *Stone v. State*, 17 S.W.3d 348 (Tex. App. 2000). But where no plausible explanation for an attorney's actions exists, to require the defendant to file a postconviction action can be only a waste of judicial time. See *Jackson v. Leonardo*, 162 F.3d 81 (2d Cir. 1998). We conclude that this is one of those rare cases. The performance of Faust's counsel was deficient, and that deficiency prejudiced her defense in a manner that fundamentally denied her a fair trial. Here, no strategy can overcome the effect of the errors that occurred. Hence, an evidentiary hearing would not change the result, would be a waste of judicial resources, and would delay the State's opportunity to retry Faust. We conclude that Faust was denied effective assistance of counsel and that the deficiency prejudiced her case; thus we reverse, and remand for a new trial.

For the same reasons that Faust was prejudiced by her counsel's failure to object, the error admitting Bluhm's testimony that was objected to was not harmless. An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt. *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988).

Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *State v. Trotter*, 262 Neb. 443, 632 N.W.2d 325 (2001); *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000). See, *State v. White*, 249 Neb. 381, 543 N.W.2d 725 (1996) (Gerrard, J., dissenting), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998); *State v. Ryan*,

249 Neb. 218, 543 N.W.2d 128 (1996) (Gerrard, J., dissenting), *overruled on other grounds, State v. Burlison, supra.*

Here, we cannot say that the guilty verdict was unattributable to the error. Although there was strong evidence of guilt, Faust presented evidence to explain her version of what happened. The jury heard prejudicial evidence about specific instances of Faust's conduct, and much of that evidence was presented at the end of the trial. Faust is entitled to have the jury view the evidence as it relates to the crime charged and not tainted by extraneous evidence about specific instances of violent and aggressive behavior. We determine that Faust is entitled to a new trial.

### SUFFICIENCY OF EVIDENCE

Upon finding error in a criminal trial, the reviewing court must determine whether the evidence presented by the State was sufficient to sustain the conviction before the cause is remanded for a new trial. *State v. Haltom,* 263 Neb. 767, 642 N.W.2d 807 (2002); *State v. Anderson,* 258 Neb. 627, 605 N.W.2d 124 (2000). In *Lockhart v. Nelson,* 488 U.S. 33, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988), the Court held that the Double Jeopardy Clause does not forbid retrial so long as the sum of the evidence offered by the state and admitted by the trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. See, *State v. Sheets,* 260 Neb. 325, 618 N.W.2d 117 (2000), *cert. denied* 532 U.S. 1019, 121 S. Ct. 1957, 149 L. Ed. 2d 753 (2001); *Anderson, supra.* We conclude that Faust can be retried without a violation of double jeopardy because the evidence was sufficient to sustain her conviction.

### OTHER ASSIGNMENTS OF ERROR

Although we have determined that Faust's convictions must be reversed and the cause remanded for a new trial, because some of her remaining assignments of error are likely to recur during retrial, we address those issues. See, e.g., *State v. Harney,* 237 Neb. 512, 466 N.W.2d 540 (1991). Generally, Faust's remaining assignments of error involve evidentiary issues that were not objected to. Thus, Faust contends that she was denied effective assistance of counsel. Although we have concerns about the nature of some of these issues, we address these issues solely to prevent errors on retrial and do not decide whether Faust was

actually denied effective assistance of counsel or if any of the errors were harmless. We do not address additional assignments of error that are unlikely to reoccur on retrial.

SELF-DEFENSE INSTRUCTION

Faust contends that the court erred by instructing the jury on self-defense when her theory of the case was that she did not commit the crimes.

We have stated that a trial court must instruct the jury on the issue of self-defense when there is any evidence adduced which raises a legally cognizable claim of self-defense. *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999); *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). To successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances. *Urbano, supra*; Neb. Rev. Stat. § 28-1409 (Reissue 1995). Justifications for the use of force in self-defense are statutorily defined. See § 28-1409. The defendant bears the initial burden to produce evidence which supports a claim of self-defense. *Urbano, supra*. We have stated that if the trial evidence does not support a claim of self-defense, the jury should not be instructed on it. *Id.* An instruction which does not correctly state the law or which is likely to confuse or mislead the jury should not be given. *Id.*

The Supreme Court of Massachusetts has addressed the question whether a defendant may veto a self-defense instruction when the theory of the case was that the defendant did not commit the crime, but evidence introduced by the state might warrant an instruction. *Commonwealth v. Souza*, 428 Mass. 478, 702 N.E.2d 1167 (1998). In *Souza*, self-defense was not the theory of the defendant's case. The court noted that a trial court must instruct on self-defense when the evidence most favorable to the defendant warrants a reasonable doubt whether the defendant acted in self-defense. The court stated that a defendant's trial strategy should be respected. The court noted that there was also no request from the defendant or the state to give the instruction. The court, however, determined that the defendant was not prejudiced by the instruction. Other courts have also determined that it

is error to instruct on self-defense when it is not the theory of the defendant's case and there is no evidence to support an instruction. See, *People v. Silver*, 16 Cal. 2d 714, 108 P.2d 4 (1940); *People v. Griner*, 30 Mich. App. 612, 186 N.W.2d 800 (1971); *Whisenhunt v. State*, 279 P.2d 366 (Okla. Crim. App. 1954).

Here, Faust did not assert self-defense and did not seek to produce evidence to support a self-defense instruction. Instead, her theory of the case was that she did not commit the crimes and that Bruce was the perpetrator. The initial burden of proof is on the defendant to produce evidence to support a self-defense claim. Faust made no effort to meet her burden of proof to support a self-defense instruction because it was not her theory of the case. Thus, there was no support for a self-defense instruction.

The State presented evidence that Faust had told Borden that she and Shannon scuffled, that Shannon got "cut," and that the gun went off. But this evidence was not presented to either prove or disprove a self-defense claim. Rather, the State presented the evidence to show that Faust had told inconsistent stories about the events of the night of the murders. Without Faust's seeking to assert a theory of self-defense, this evidence does not warrant a self-defense instruction.

We determine that when the defendant makes no effort to meet the initial burden of proof to prove self-defense and when self-defense is not the defendant's theory of the case, a self-defense instruction is not warranted. A theory of self-defense necessarily involves an inference or admission that the defendant harmed the victim, but that the defendant's acts were justified. By giving a self-defense instruction when the defendant's theory of the case is that he or she did not commit the crime, the court risks confusing or misleading the jury. We conclude that the court erred by giving a self-defense instruction and that Faust's attorney should have objected to the instruction. Instead, Faust's attorney asked for an additional self-defense instruction. If the issue whether to give a self-defense instruction arises on retrial, an instruction should not be given if it is not warranted by Faust's evidence.

## VICTIM PHOTOGRAPHS

Faust next contends that the court erred in allowing into evidence photographs of the victims taken when they were alive.

During trial, Desiree identified a photograph of Robert that was taken when he was alive. The photograph depicts Robert sitting on a couch with his arm around a dog. She also identified a photograph that was taken of Robert's body after his death. The State asked her if Robert had the injuries depicted in the photograph when he left the house on April 25, 2000. Desiree answered "[n]o."

Shannon's mother also identified a photograph of Shannon that was taken when she was alive. She also identified Shannon in a photograph taken after her death. The photographs were entered into evidence without objection.

The admission of photographs into evidence rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect. *State v. Clark*, 255 Neb. 1006, 588 N.W.2d 184 (1999). See § 27-403. In a homicide prosecution, photographs of a victim may be received into evidence for purposes of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent. *Clark, supra.* We have held that a photograph which is admitted at trial depicting a victim while he or she was alive is not offered for a proper purpose. *Id.*

Here, the photographs of the victims depicting them when they were alive were not relevant to show the condition of the body or the extent of the wounds, or to establish malice or intent. The State contends that the photographs were necessary for identification, but this argument ignores that both victims were identified in photographs taken after their deaths. We conclude that the photographs were not offered for a proper purpose. Photographs of the victims taken when they were alive should not be allowed into evidence on retrial.

### FAUST'S STATEMENT "IT'S MY DOING"

Faust contends that she was entitled to a hearing under *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), to determine whether her statement "it's my doing" was voluntarily made. The State contends that the issue was waived because Faust failed to move to suppress the statement. In the alternative, the State contends that a hearing was not required

because the statement was not made to law enforcement officers and was properly used on rebuttal to impeach Faust's assertion that she did not commit the crimes.

Before trial, the court held a *Jackson v. Denno* hearing about various statements Faust made to Bergman when he first went to Faust's residence. The court determined that the statements could be used at trial because Faust was not in custody at the time she made the statements and the statements were voluntarily made.

At trial, Bergman testified that while he was at Faust's residence, Faust voluntarily provided information about what she had done on April 25, 2000. She told him that she had taken a bicycle ride and that Shannon had picked her up.

A deputy with the Otoe County Sheriff's Department testified about a statement he overheard Faust make at her home during the early morning hours of April 26, 2000. He testified that he was in the kitchen with Faust and Borden and heard Faust say, "It's not your fault, it's my doing." On cross-examination, he testified that right before Faust's statement, Borden said, "This is my fault, I shouldn't have talked you out of moving." Faust's attorney objected to the testimony, stating that his understanding was that only Bergman was going to testify about statements volunteered by Faust and that the statement the deputy overheard was subject to a *Jackson v. Denno* hearing. The State responded that it told Faust's attorney that the statement might be used in rebuttal and argued that a *Jackson v. Denno* hearing was not needed for rebuttal evidence. The court overruled the objection without explaining its reasoning.

Admission of an involuntary confession is precluded by the Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). To be admissible, a statement or confession of an accused must have been freely and voluntarily made. *Id.* A defendant who objects to the voluntariness of a statement is entitled to a hearing in which both the underlying factual issues and the voluntariness of the statement are actually and reliably determined. See, *Jackson, supra*; *Harris, supra*. An accused may move for suppression of a statement that he or she claims is involuntary. *Harris, supra*. An objection to such a statement is waived if it is not raised by motion before trial, with the

exception that a court may entertain motions to suppress after the commencement of trial when the defendant is surprised by the statements introduced by the State. *Id.*; Neb. Rev. Stat. § 29-115 (Cum. Supp. 2002). We review the determination whether to entertain a motion to suppress made after the commencement of trial for an abuse of discretion. *Harris, supra.*

A *Jackson v. Denno* hearing may be appropriate even when the allegedly involuntary statement is made during rebuttal. *Loftin v. State*, 180 Ga. App. 613, 349 S.E.2d 777 (1986). A *Jackson v. Denno* hearing is not required for a statement that is being introduced solely for impeachment purposes, but the defendant may be entitled to a determination of voluntariness by the trial court, although not necessarily in the context of a *Jackson v. Denno* hearing. *Id.* Under § 29-115, a court may entertain a motion to suppress after the commencement of trial when the defendant is surprised or was previously unaware of the grounds for the motion. The decision to entertain the motion, however, is at the trial court's discretion. *Harris, supra.*

Here, we are unable to determine from the record whether the court denied Faust's request for a hearing because it erroneously believed that a *Jackson v. Denno* hearing was never required for rebuttal evidence or because it had decided in its discretion to deny the motion despite Faust's contentions of surprise about the testimony. Nor is it clear from the record that the statement was introduced solely for impeachment purposes. Because we are unable to make these determinations, we do not consider the issue to be waived, and we address Faust's arguments.

We have held that an accused's statement, whether an admission or a confession, made to private citizens, as well as to law enforcement personnel, must be voluntary as determined by a court for admissibility and as a fact ascertained by the jury. *State v. Kula*, 260 Neb. 183, 616 N.W.2d 313 (2000). That Faust made the statement to Borden does not preclude the need for a hearing.

Had Faust raised the issue before trial in a motion to suppress, she would have been entitled to a hearing. But because she waited to raise the issue, the court could entertain or deny the motion at its discretion. But we are unable to tell from the record whether the trial court properly considered Faust's claim of surprise when it chose to deny the motion. We note that the court would not have

abused its discretion by denying the hearing. Faust does not contend that her statement was involuntary. Instead, she sought a hearing without ever alleging any specific instances of coercion. In addition, other statements made by Faust around the same time and under the same circumstances were found to be voluntary. Further, when taken in the context of the entire conversation between Faust and Borden, it would have been reasonable for the court to question whether the statement was an admission at all. Finally, the trial court could have questioned whether Faust was actually surprised by the testimony about her statement. While Faust claimed to be surprised by the introduction of the statement, the State alleged that it had informed the defense that the statement might be used on rebuttal. Thus, it would have been reasonable for the court to deny the hearing.

We conclude that on retrial, issues regarding the voluntariness of Faust's statement should be addressed before trial. If Faust fails to raise the issue before trial, the court should either hold a hearing if one is later requested or explain its reasons if a hearing is denied.

## EVIDENCE OF BORDEN'S CHARACTER

Faust contends that the court erred in allowing testimony about Borden's character for peacefulness. There was no objection to the testimony. We note that Faust raised the issue first when Seip provided testimony that Bruce physically abused Faust. As a result, Seip testified that she heard Borden state that he would "bury" Bruce if he touched Faust again. The State then explored the issue further on cross-examination of both Seip and Borden. We do not address this issue on appeal, but should the issue arise again on retrial, we caution the attorneys and the court to consider the purpose for which the testimony is offered and whether the testimony is admissible under Neb. Rev. Stat. § 27-608 (Reissue 1995).

## CONCLUSION

We conclude that the district court erred in allowing testimony about a specific instance in which Faust acted in a violent and threatening manner. We further conclude that Faust was denied effective assistance of counsel because there were no objections to evidence of numerous additional instances of Faust's conduct.

The admission of the evidence and the ineffective assistance of trial counsel were prejudicial to Faust's defense and resulted in a fundamentally unfair trial. As a result, she is entitled to a new trial. Faust raised additional assignments of error that we do not address, including a charge of prosecutorial misconduct and an argument that the cumulative effect of the errors at trial or instances of ineffective assistance of counsel denied her right to due process. While we do not specifically address those assignments of error, we note that we have addressed a number of issues that may arise on retrial.

REVERSED AND REMANDED FOR A NEW TRIAL.

STEPHAN, J., dissenting.

I respectfully dissent. In my view, the trial record affords an insufficient basis for determining whether trial counsel for Kimberly Sue Faust was constitutionally ineffective, and therefore I would not reach that issue in this direct appeal. Because I perceive no prejudicial error occurring at trial, I would affirm.

The majority concludes that reversal is necessary because the trial court received certain testimony which the majority determines to be inadmissible under the statutory rules of evidence which govern criminal trials in Nebraska. However, those rules provide in part:

(1) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

(a) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if a specific ground was not apparent from the context[.]

Neb. Rev. Stat. § 27-103 (Reissue 1995). From this rule, we derive a basic tenet of appellate review that a prerequisite to an appeal based upon error in the admission of evidence is a timely objection stating the grounds therefor, unless the grounds are apparent from the context. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). The failure to make a timely and proper objection or motion to strike will ordinarily bar a party from later claiming error in the admission of testimony. *Id.* Put simply, no trial error ordinarily results from receiving evidence to which there is no objection.

With a single exception, there was no objection to the testimony on which the majority predicates reversible error. The majority bridges this gap by accepting Faust's argument that her trial counsel performed in a constitutionally deficient manner by failing to object, thereby enabling the majority to consider whether an objection, if made, would have resulted in exclusion of the evidence. The majority acknowledges the well-established principle that where ineffective assistance of counsel is claimed, there is a strong presumption that counsel acted reasonably. See, *State v. Zarate*, 264 Neb. 690, 651 N.W.2d 215 (2002); *State v. Al-Zubaidy*, 263 Neb. 595, 641 N.W.2d 362 (2002). Under this principle, trial counsel is afforded due deference to formulate trial strategy and tactics, and an appellate court will not second-guess reasonable strategic decisions made by counsel. *State v. Al-Zubaidy, supra*; *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000). The decision whether to object or not to specific questions posed to a witness is a strategic decision made by trial counsel to which this rule applies. *State v. Williams*, 259 Neb. 234, 609 N.W.2d 313 (2000).

Today, for the first time in our jurisprudence, this court determines from a record on direct appeal that defense counsel was constitutionally deficient in not making certain evidentiary objections at trial. The majority concludes that it is "unable to conceive of any reasonable trial strategy" which would have supported a decision not to object to the questions which elicited testimony regarding Faust's actions toward her estranged husband, Bruce Faust, and Shannon Bluhm during the period of their extramarital relationship. This reasoning ignores the reality that trial strategy is often shaped by factors known to trial counsel which do not necessarily appear in the record on direct appeal and are, therefore, unknown to a reviewing court.

Evidence introduced during a criminal trial "will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose facts necessary to decide either prong of the *Strickland* analysis." *Massaro v. United States*, No. 01-1559, 2003 WL 1916677 at *4 (U.S. Apr. 23, 2003). Although the U.S. Supreme Court acknowledged in *Massaro* that there may be cases in which a claim of ineffective assistance of counsel could be resolved on the basis of the appellate record, it also reasoned that

"few such claims will be capable of resolution on direct appeal," 2003 WL 1916677 at *6, and that the "better-reasoned approach" is to permit ineffective assistance claims to be asserted in the first instance in a collateral proceeding under 28 U.S.C. § 2255 (2000), the federal postconviction remedy, 2003 WL 1916677 at *3. The Court reasoned that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance," noting that a collateral postconviction proceeding affords "the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Massaro*, 2003 WL 1916677 at *4.

Indeed, while we may consider and resolve claims of ineffective assistance of trial counsel asserted on direct appeal, we frequently decline to do so because the record is insufficient to permit meaningful review. See, e.g., *State v. Long*, 264 Neb. 85, 645 N.W.2d 553 (2002); *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001); *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999). In the limited number of cases in which we or the Nebraska Court of Appeals have reached the issue of ineffective assistance of counsel on direct appeal, the record presented questions of law, not questions of trial strategy. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995) (finding because defendant lacked reasonable expectation of privacy with respect to areas searched, counsel not deficient in handling motion to suppress); *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991) (finding evidence sufficient to support charge and thus counsel not deficient in failing to move for directed verdict), *abrogated on other grounds, State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995); *State v. Fletcher*, 8 Neb. App. 498, 596 N.W.2d 717 (1999) (finding enhancement evidence reliable as matter of law and thus counsel not deficient in offering additional evidence on subject). Where claims of ineffective assistance of counsel are dependent upon facts which do not appear in the trial record, Nebraska appellate courts consistently defer resolution to postconviction review. See, *State v. Hert*, 192 Neb. 751, 224 N.W.2d 188 (1974) (declining to reach on direct appeal whether counsel deficient in failing to file motion to discharge); *State v. Kellogg*, 10 Neb. App. 557, 633 N.W.2d 916 (2001)

(declining to reach on direct appeal whether counsel deficient in forgoing presentence investigation).

I see no reason in this case to depart from this sound practice. In my view, the strong presumption that trial counsel acted reasonably cannot be overcome by speculation regarding strategy. Thus, whether a court can or cannot examine the trial record and "conceive" of a reason why defense counsel did not object to certain questions during trial is not the issue. On direct appeal, a reviewing court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse." *Massaro*, 2003 WL 1916677 at *4. Without knowing the reasons, and strategic considerations, if any, upon which defense counsel acted or refrained from acting, we are simply not in a position to judge whether counsel's performance was constitutionally deficient. This determination will ordinarily require consideration of facts extrinsic to the trial record. Our statutory postconviction remedy, which is designed to determine whether a conviction should be set aside because it was obtained through a denial or infringement of the constitutional rights of the accused, specifically provides for an evidentiary hearing where a proper allegation of denial of constitutional rights cannot be refuted by the files and records of the original prosecution. Neb. Rev. Stat. § 29-3001 (Reissue 1995). See, also, *State v. Nesbitt*, 264 Neb. 612, 650 N.W.2d 766 (2002); *State v. Caddy*, 262 Neb. 38, 628 N.W.2d 251 (2001). In a case such as this, where, in my view, the trial record does not clearly establish or refute a claim of deficient performance of counsel, the presumption that counsel acted reasonably is not overcome on direct appeal. A subsequent postconviction proceeding affords a more complete and objective basis for deciding the issue. I would therefore decline to reach the claims of ineffective assistance of trial counsel on this direct appeal.

The only assigned error preserved by a trial objection involved the testimony of Jeff Bluhm (Bluhm) regarding a confrontation between Faust and Shannon in January or February 2000. I agree with the majority that this testimony was not admissible on the narrow issue of Faust's character under Neb. Rev. Stat. § 27-405 (Reissue 1995). While I believe that this evidence may have been

independently relevant on the issue of Faust's motive, and thus admissible under Neb. Rev. Stat. § 27-404(2) (Reissue 1995), it was ultimately not offered for this purpose, and the procedures outlined in *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999), were not followed. Nevertheless, I conclude that the error in admitting Bluhm's testimony was harmless beyond a reasonable doubt.

Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Duncan, ante* p. 406, 657 N.W.2d 620 (2003); *State v. Brouillette, ante* p. 214, 655 N.W.2d 876 (2003). Based upon my review of the record, I am satisfied that the guilty verdict was surely unattributable to the erroneous admission of evidence relating to Faust's confrontation with Shannon several weeks prior to the homicides. I reach this conclusion for two reasons.

First, to the extent that the evidence in question raised an inference that Faust is a person capable of violence, it is cumulative. As the majority acknowledges, Faust admitted that the physical abuse in her marriage sometimes "went both ways" and admitted to incidents in which she was physically aggressive toward Bruce.

More importantly, however, I regard the admission of the character evidence as harmless because the record reflects overwhelming evidence of guilt which is not in any way dependent upon character evidence. Utilizing DNA evidence, the State proved that blood found on the exterior and interior of the driver's side of Faust's vehicle was that of the victims. It is undisputed that the fatal shots were fired from the handgun which was in Faust's possession before and after the crimes were committed. Faust admitted that she was present when the shootings occurred and that the shots were fired from the handgun that she carried in her vehicle.

Faust's defense was that Bruce shot the victims while she helplessly watched. The State was able to substantially impeach this testimony without resort to Bluhm's testimony. On cross-examination, Faust admitted that her trial testimony was inconsistent with two prior accounts she had given regarding the

events at the crime scene. The State was also able to establish inconsistencies between Faust's trial testimony and certain known time sequences. According to Faust's testimony, she and Shannon arrived at the rural location where Faust had left her vehicle sometime after 9:20 p.m. This location was approximately 5 miles from Eagle. Faust testified that as she and Shannon sat and talked in Shannon's vehicle, Bruce arrived and entered the vehicle from the front driver's side. Faust testified that she and Bruce had an argument at that time which led to a physical altercation occurring inside the vehicle between the three of them. Faust testified that she then exited the vehicle, entered her own vehicle, and drove a short distance away. After several minutes, Faust returned to the area where Shannon's vehicle was parked and observed that the vehicle was on fire.

Bruce denied committing the murders. In direct contrast to Faust's testimony, telephone records reveal that Bruce was at his home in Eagle talking to his daughter on the telephone between 9:22 and 9:29 p.m. Witnesses observed the burning vehicle between 9:25 and 9:35 p.m. Desiree Parminter reported the burning vehicle in a 911 emergency dispatch call to the Otoe County sheriff's office that was received at approximately 9:43 p.m. On this evidence, the jury could reasonably have chosen not to believe that Bruce traveled approximately 5 miles from his home to the crime scene, entered Shannon's vehicle, engaged in a physical altercation with Faust and Shannon in the vehicle, and then set fire to Shannon's vehicle, all within what at most would amount to a 14-minute time period. Most importantly, the jury could have arrived at such conclusion without considering the erroneously admitted character evidence in any manner.

For these reasons, I would affirm the judgment of the district court.

HENDRY, C.J., joins in this dissent.